UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Keith Snyder and Susan Mansanarez, individually and on behalf of all others similarly situated, <br><br> Ocwen Loan Servicing, LLC, | Case No. 1:14-cv-08461 <br><br> Honorable Matthew F. Kennelly <br><br> Consolidated |
| Tracee A. Beecroft, on behalf of herself and all others similarly situated, <br><br> Ocwen Loan Servicing, LLC, | Case No. 1:14-cv-08461 <br><br> Honorable Matthew F. Kennelly <br><br> Consolidated |

**Declaration of Sherri Goodman**

I, Sherri Goodman, hereby declare as follows pursuant to 28 U.S.C. §1746:

1. I am Senior Vice President of Contact Center Operations at Defendant Ocwen Loan Servicing, LLC ("Ocwen"). I have held that position since March 24, 2014. My responsibilities include overseeing global customer service operations for the approximately 1.4 million mortgage accounts that Ocwen services.

2. I make this declaration based upon my personal knowledge and experience, and upon my review of records kept in the normal course of Ocwen's business.

3. I make this declaration to describe the following matters to the Court:

- the reasons why Ocwen calls borrowers,
- the important role of such calls in helping borrowers keep current with their mortgage payments and/or stay in their homes,
- the role that autodialing plays in such calls,
- Ocwen's procedures for safeguarding against autodialed calls to borrowers who have not consented to being called on their cell phones,
- and the reasons why entering an injunction enjoining use of the autodialer would be harmful for borrowers, investors, and Ocwen's business operations.

## I. Ocwen's role as mortgage loan servicer

4. Most of the loans that Ocwen services are originated by brokers or other lenders, and then sold to a special purpose REMIC ("Real Estate Mortgage Investment Conduit") trust. The trust then sells securities entitling holders to a share of the income to the trust, which includes things like borrowers' monthly

principal and interest payments. The trust engages an entity such as Ocwen to service the loans.

5. A document called a Pooling and Servicing Agreement ("PSA") typically defines the rights and obligations of the securitization trustee, investors, and servicer. As a servicer, Ocwen is generally responsible for (among other things) sending borrowers their mortgage statements, collecting and accounting for borrowers' loan payments, and communicating with borrowers about their loans.

## II. Why Ocwen calls borrowers

6. In addition to collecting and accounting for mortgage payments, one of Ocwen's principal responsibilities as servicer is to communicate with borrowers about their loans. Ocwen communicates with borrowers by mail, email, and telephone.

7. Many of Ocwen's communications with borrowers are by telephone. Since January of 2016 Ocwen has made approximately 70 million calls to borrowers. These calls have resulted in about 3 million contacts with borrowers. Ocwen maintains records regarding these calls in the form of call logs identifying when calls were made, written notes outlining the substance of the calls, and audio recordings of the calls.

8. Most of Ocwen's calls to borrowers are to those who are late with their mortgage payments. Of the 1.4 million mortgages currently serviced by

Ocwen, 20% were delinquent by more than 30 days in November, which was a typical month. Ocwen makes daily collection calls to borrowers who are more than 16 days past due on their mortgage, until contact is made to remind the borrower that his or her payment is past due. Once Ocwen makes contact with a borrower, Ocwen will stop making collection calls to the borrower for at least seven days, regardless of the outcome of the call. If a borrower promises to pay, Ocwen will stop making calls to that borrower until after the date promised. If a borrower makes a payment that cures the delinquency, then Ocwen will stop calling the borrower immediately. This cessation of calls is accomplished by removing the borrower's phone number from the dialing campaign. I understand that Plaintiffs refer to something that they call Ocwen's "reminder call" program. Ocwen does not have any such program if by that Plaintiffs mean calls to borrowers made before they are 16 days past due on their payments. The calls Ocwen makes when borrowers are 16 days or more past due are part of Ocwen's collection program.

9. Ocwen's Home Retention Department also makes calls to inform borrowers about steps they can take to avoid foreclosure, including short-sales and loan modifications through the Home Affordable Modification Program ("HAMP"). For example, in 2015, Ocwen completed approximately 70,000 loan modifications (which was 25% of all loans serviced by Ocwen that were in

default). Ocwen is an industry leader in the number of loan modifications it makes. The United States Department of Treasury released its "Making Home Affordable Program Performance Report" in September, 2016 noting that Ocwen had completed 324,939 permanent loan modifications through the HAMP program, which represents approximately 20% of all completed permanent HAMP modifications. Ocwen completed 52% more loan modifications than the next best servicer. Ocwen's ability to maintain its leadership in keeping financially challenged borrowers in their homes depends heavily on Ocwen's ability to make calls to borrowers.

### III. How Ocwen calls borrowers

10. Ocwen maintains borrower information in a computerized servicing system known as REALServicing. Data in REALServicing includes contact information for borrowers. For each telephone number, it also includes a field showing if that number is understood to be a cell phone or a landline.

11. The first time Ocwen calls a borrower on his or her cell phone, that call is made manually – i.e., an Ocwen representative uses his or her fingers to physically dial the phone number – on a hard desktop Cisco phone or through the Cisco application on the representative's computer.

12. During manually-dialed outbound calls or any inbound call from a borrower, Ocwen call center procedure requires agents to ask the borrower for

consent to call his or her cell phone with Ocwen's automated phone system, if this consent is not already noted in REALServicing. If a borrower consents to being called on his or her cell phone with this system, Ocwen may subsequently use an autodialer to call that borrower.

13. An autodialer is a system that has the capacity to store telephone numbers and call those numbers in a prescribed sequence and frequency. Ocwen uses a dialer system developed by Aspect Software Inc., which enables Ocwen to upload lists of phone numbers for the Aspect system to dial, and then connects an Ocwen representative to a communication line once the call has been answered. The Aspect dialer system can also make "soft calls," which enables an Ocwen representative to open a "Manual Outbound" screen, manually enter a telephone number on a keypad using fingers, and click "dial."

14. The use of an autodialer allows Ocwen to contact many more borrowers than it would be able to contact if it had to dial each borrower manually. The autodialer is capable of making 150-175 calls per hour per representative logged in. A representative is capable of making 20-25 manual calls per hour. It is to borrowers' advantage to be contacted efficiently and expediently. Although some borrowers seek to avoid calls about late payments, such calls allow borrowers to avoid late charges and the significant negative consequences of long-term payment deficiencies.

15. The use of an autodialer also reduces the cost of contacting borrowers by approximately 80%. This means that the cost of servicing is significantly reduced, which benefits both borrowers and the holders of the loans.

16. Ocwen determines which phone numbers are to be loaded into its autodialer on any given day by identifying which borrowers are late on their payments, and the relative lateness of those payments. When phone contact is made with a delinquent borrower, that borrower's phone number is removed from the autodialer within 30 minutes of that contact so the borrower is not autodialed again for at least seven days concerning that same past due payment.

## IV. Ocwen's procedures for avoiding autodialed calls to cell phones without consent

17. REALServicing contains contact telephone numbers for borrowers, and identifies those numbers as landline or cell phone numbers. It is important to Ocwen that this designation is accurate. In May of 2014 Ocwen implemented a procedure which compares all phone numbers in REALServicing with data in Areacode.com – a publicly accessible website that allows a user to enter an area code and the first three digits of a phone number to identify whether the number is a landline or a cellular phone. Ocwen compares phone numbers in REALServicing against Areacode.com twice a week, and for any numbers identified in REALServicing as landline numbers but identified in Areacode.com as cell phone numbers, Ocwen changes the REALServicing designation to reflect that it is a cell

phone number. Ocwen has recently updated and enhanced the process by which it identifies cell phone numbers and landline numbers as described in (¶ 27 ) below.

18. Beginning in December 2014, Ocwen added a consent field to REALServicing to track whether a borrower had consented to being called using an autodialer on his or her cell phone. When the consent field was added in 2014, it was initially set to "P" for Pending for borrowers. During subsequent inbound calls and manually-dialed outbound calls, Ocwen representatives asked borrowers if they consented to being called on their cell phone using an autodialer. If a borrower gave consent, the consent field for that borrower was set to "Y," and if the borrower declined consent, it was set to "N".

19. The consent field in REALServicing determines whether a borrowers' cell phone number will be autodialed; if the flag is not set to Y, the number is not added to the list of numbers that are loaded into the autodialer. It is of great importance to Ocwen, then, that the consent flag is set accurately.

20. Ocwen is constantly seeking to improve its procedures for contacting borrowers to ensure compliance with applicable laws and regulations, including the TCPA. First, Ocwen has recently improved its procedures to train and coach representatives who are contacting borrowers. Second, Ocwen has recently improved the process involved in contacting the borrower. Third, Ocwen has

recently enhanced its technological capabilities to make calls and to document borrower contact information. I describe these changes below.

### A. People

21. Ocwen's autodialing process includes significant involvement from Ocwen representatives. Because of the role individual representatives play in making calls (e.g. speaking to borrowers and updating REALServicing records), human error is inevitable. Ocwen has taken steps to minimize such human error.

22. In October 2016, Ocwen implemented classroom refresher training courses to ensure that all Ocwen representatives are aware of the procedures in place to prevent TCPA violations.

23. Also in October 2016, Ocwen changed its incentive compensation plan to provide greater emphasis on compliance with TCPA-related procedures. If a representative fails to update a borrower's consent field accurately, our quality control system scores that failure as a "critical compliance defect." Any representative who is evaluated with a critical compliance defect for a given month is ineligible to receive any incentive compensation for that month.

24. Ocwen has also revised the scripts used by its representatives. Since July 2016, representatives are prompted in detail to ask a borrower if a call-back number provided by the borrower is a cell phone number or not. If the borrower has provided a cell phone number and has not previously provided consent, the

representative is prompted to ask if the borrower consents to being contacted on that number using an autodialer.

25. Since September 2016, the scripts used by Ocwen representatives have been updated to prompt representatives to change the consent field to "N" when the recipient of one of our outbound calls asks not to be called, even if the borrower does not authenticate his or her identity. Previously, Ocwen had required authentication that the recipient of the call was in fact the borrower, before making such a change to the account status. Ocwen's call scripts have also been updated to prompt Ocwen representatives to note any accounts where an individual believes he or she is being contacted in error. Numbers with that flag are automatically excluded from any dialing campaigns on the autodialer.

26. The changes in training, incentive plans, and scripting are designed to ensure that Ocwen maintains the most accurate consent records for borrowers possible. These consent records in turn allow Ocwen to efficiently use the autodialer while minimizing the risk of violating the TCPA.

**B. Processes**

27. In July 2016, Ocwen added a new process to determine whether phone numbers recorded in REALServicing are cell phone numbers. This new process compares every number in REALServicing to Neustar's wireline-to-wireless data file every day. Neustar's data sources are widely considered to be the best in the

industry for accurately assessing which numbers are landlines and which are cell phones. Numbers that are identified as wireless will be updated to "cell" in REALServicing. The Neustar process has improved the accuracy of Ocwen's data regarding phone numbers being landline or cell numbers.

28. In December 2016, Ocwen signed a three-year contract with Neustar for daily monitoring of all phone number data in REALServicing to ensure that any and all cell phone numbers are indicated as such in REALServicing. This new process will give Ocwen the most up-to-date and accurate information available in the industry regarding which phone numbers in its system are cell phone numbers.

29. Beginning in January 2016, Ocwen created a daily control report to detect any calls that may have been made in violation of the TCPA or related Ocwen procedures. Ocwen generates this report by running daily queries on the REALServicing database and comparing the outputs to calls that the autodialer has made. For example, every day Ocwen will get a list of all numbers that were called using the autodialer the prior day. Ocwen will then run a query in REALServicing to determine whether any of those numbers has a "P" or "N" in the consent field. If a number with a consent field reading "P" or "N" has been dialed using the autodialer, the call center operations control team will investigate the error and diagnose the root cause. By reviewing these records daily, this team

is able to determine whether autodialer calls have been made to cell phones in error, and quickly remediate any problems.

30. An additional control report was implemented in August 2016 to identify any calls in which a representative was informed that Ocwen called a wrong number, and the phone number data in REALServicing was not properly updated. This report enables the detection of any mistake made by agents in removing phone numbers reported as incorrect. The call center operations control team monitors this report daily, making any phone number corrections needed and providing feedback to agents about errors detected.

### C. Technology

31. Ocwen has also recently made technological improvements designed to better ensure its compliance with laws and regulations. Some borrowers have multiple mortgage loans serviced by Ocwen. Starting in February 2016, Ocwen implemented technology that suppresses the autodialing of a cell phone number on all accounts that use that phone number if the consent status is "N" for any account. For example, if a borrower revokes consent to being autodialed at a cell phone number, that number will be suppressed from the autodialer for all related accounts that list that cell phone number as a contact number.

32. Since December 2016, if a borrower requests that Ocwen stop calling, an Ocwen representative will raise a CNC ("Courtesy no Call") flag on his or her account which will prevent any future collections calls on that account.

33. As a result of implementing these improvements, enhancements and upgrades, Ocwen has a much more robust set of safeguards and checks than it did even two years ago, thus promoting its ability to perform its functions as a servicer while minimizing the risk of violating the TCPA or other legal or regulatory requirements.

## V. Skip tracing procedures

34. I understand that Plaintiffs in this case have raised concerns about Ocwen's skip tracing procedures in their Motion for Limited Certification and Preliminary Injunction, so I will address our skip tracing process here. Borrowers sometimes do not provide Ocwen with accurate and up-to-date contact information. In order to contact these borrowers and perform its servicing obligations, Ocwen acts to obtain contact information for borrowers from other sources.

35. When all phone numbers for a borrower are flagged by representatives or the dialer as incorrect or disconnected, REALServicing raises a Skip Tracing flag on the borrower's account. Ocwen's Skip Tracing team investigates loans

with this flag, and works to locate a valid telephone number using one or more of three industry data sources.

36. Ocwen procedure dictates that a number must be verified using two different sources before a representative can add a new phone number to an account in REALServicing. A skip tracing agent may use one of the three industry data sources (e.g., CBC Innovis) as one source of verification and use a verbal verification as the other source. To obtain verbal verification, a skip tracing agent manually dials the number and attempts to make contact with the borrower. If the agent reaches the borrower or hears a voice mail message with the full name of the borrower, the agent will add the phone number to the borrower's account. Unless the borrower consents during this phone call to Ocwen's use of the autodialer for cell phone calls, the skip tracing agent will leave the TCPA consent field set as "N" (i.e., no consent) for this new number. All future calls made to this number will be dialed manually unless and until the consent field changes to "Y".

37. REALServicing does not track systematically which new telephone numbers added to REALServicing were identified through skip tracing. For some borrowers, it is possible that the comments section of REALServicing will indicate that a number has been added after skip tracing, but a loan-by-loan review would be necessary to make that determination.

38. Skip tracing is important to Ocwen, because it allows Ocwen to make outbound calls necessary to performing its servicing function when a borrower fails to provide valid or updated contact information.

## VI. Automatic Number Identification (ANI) procedures

39. I understand that Plaintiffs also question Ocwen's use of an Automatic Number Identification ("ANI") system to capture the number from which an inbound call is dialed.

40. ANI functions just like the "Caller ID" function with which most people are familiar. When a borrower calls Ocwen, Ocwen notes the number identified through the ANI (or "Caller ID") technology. For loans on which the Skip Tracing flag has been raised, as described in ¶ 35 above, an Ocwen skip tracing agent places a manual outbound call to the number (as described in ¶ 36 above). The representative will ask the borrower if he or she consents to being contacted on that number using an autodialer.

41. If a borrower consents, the consent flag is changed from "P" to "Y" in REALServicing. If the borrower denies consent, the consent flag is changed from "P" to "N" in REALServicing.

42. As with skip tracing generally, REALServicing does not track systematically which new telephone numbers added to REALServicing were captured through ANI.

43. ANI capture is important to Ocwen because, as stated in ¶ 38 above, it assists Ocwen with finding valid phone numbers with which Ocwen can make outbound calls necessary to performing its servicing function when a borrower fails to provide valid or updated contact information.

## VII. Necessity of autodialer

44. If the court enters an injunction barring Ocwen from making autodialed calls to borrowers, Ocwen would be seriously handicapped in performing its job as a mortgage servicer. An injunction would also burden investors who would not be able to benefit from the increased efficiency produced by the auotdialer. The injunction would also burden borrowers because Ocwen does not have the capacity to call borrowers manually to discuss loss mitigation options and mortgages that are in default in the same manner and with the same frequency that has led Ocwen to being the industry leader in keeping borrowers in their homes through loan modifications.

45. I estimate that to overcome the lost call volume attributable to the efficiency of the autodialer Ocwen would need approximately 1,500 additional call center representatives to dial manually those calls that it now autodials. To hire and train this additional capacity and implement the supporting infrastructure where all calls are manually dialed, Ocwen would need 9-12 months. To hire and train these persons would cost approximately $3,500 each -- $2,500 to hire and

train and $1,000 for infrastructure including computers and office space. These are blended rates taking into account Ocwen's U.S. and offshore calling operations. The total investment for adding this extra capacity would then be 1,500 x $3,500, approximately $5 million. The cost of employing these persons would be approximately $15,000 per person annually (again, a blended rate) so, Ocwen would need to spend approximately $25 million dollars annually to maintain this additional calling capacity. This is six times more than the current cost. To put that in perspective, Ocwen's net earnings were $9 million last quarter.

46. An injunctive restriction on Ocwen's use of an autodialer would reduce our capacity to contact customers by over 80%. This reduction in calling capacity would be immediate and would negatively impact our ability to connect with troubled borrowers.

47. The investors in trusts serviced by Ocwen scrutinize Ocwen's calling and collection metrics to ensure Ocwen is devoting sufficient resources to these tasks, and servicer ratings are in part based on such metrics. If Ocwen were barred from using an autodialer, the immediate 80% drop-off in Ocwen's call volume would drastically impair these metrics and would cause investors, and likely some regulators, to conclude that Ocwen was falling short of accepted servicing standards. This in turn might lead some investors to seek to remove Ocwen as servicer for trusts in which they have investments. Although I cannot say with

certainty what the consequences to Ocwen would be, I can confidently state that Ocwen's ongoing relationships with investors and regulators would be significantly harmed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 21, 2016.

*Sherri Goodman*
Sherri Goodman

Case: 1:14-cv-08461 Document #: 128-3 Filed: 12/21/16 Page 18 of 18 PageID #:1302