**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **KEITH SNYDER and SUSAN MANSANAREZ, individually and on behalf of all others similarly situated,** | ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 14 C 8461** |
| **OCWEN LOAN SERVICING, LLC,** | ) ) | |
| **Defendant.** | ) | |
| ------------------------------------------------------------- | ) | |
| | ) | |
| **TRACEE A. BEECROFT, individually and on behalf of all others similarly situated,** | ) ) | |
| | ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **Case No. 16 C 8677** |
| **OCWEN LOAN SERVICING, LLC,** | ) ) | |
| **Defendant.** | ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Keith Snyder and Susan Mansanarez filed suit against Ocwen Loan Servicing,

LLC, alleging that Ocwen made debt-collection phone calls using an autodialer in

violation of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, and the

Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1642.  Snyder and

Mansanarez sued on behalf of a class of similarly situated plaintiffs.  They have moved

for a preliminary injunction to prevent Ocwen from continuing practices that allegedly

violate the TCPA and certification of a limited class for this purpose. Plaintiffs are separately moving for certification of a class on all their claims, including their claims for damages, but due to the need for discovery that motion was only recently filed.

For the reasons stated below, the Court concludes that plaintiffs have established the basis for certification of a limited class under Federal Rule of Civil Procedure 23(b)(2) and an entitlement to at least some of the preliminary injunctive relief they seek. But the Court defers entry of a class certification order or a preliminary injunction pending further submissions, as described at the end of this opinion.

**Background**

Ocwen is a mortgage servicing company that is licensed in all fifty states. It is hired to service loans by, typically, the original lender's assignee. The job of servicing includes collecting payment from the mortgagor. To this end, Ocwen maintains call centers from which its employees contact mortgagors about their outstanding loans.

In 2001, Snyder purchased a home in Las Vegas, Nevada. He refinanced his mortgage in 2006 and took out two loans, one with Countrywide Home Loans and a junior-position home equity line of credit with Greenpoint Mortgage Funding. The junior-position loan had a principal balance of approximately $100,000. According to Snyder, he initially made timely loan payments but eventually was unable to do so and stopped payment around April 2007. At this time, Snyder's senior creditor began the process of non-judicial foreclosure under Nevada law.

Pursuant to this procedure, Snyder's home was sold at a trustee's sale in January 2008 for $625,727.34. Snyder alleges that this price fully satisfied the senior mortgage obligation of $585,504.56 and left at least $40,000 to pay towards the junior

creditor. At the time of foreclosure, Snyder still owed the junior creditor $99,968.08. In August 2009, Snyder received notice from a new servicer informing him that it had received the rights to the loan from Greenpoint and that the outstanding balance of the loan was $126,049.08. In July 2014, Snyder was again notified that his loan had been transferred—this time, to Ocwen. Ocwen sent Snyder a letter that indicated that the principal loan balance was $99,968.08 but that the total owed after interest and fees amounted to $181,673.67.

Snyder alleges that immediately following this letter, he began to receive calls from Ocwen on his cellphone number ending in 7690. Snyder says that he did not acquire this cellphone number until 2012 and therefore could not possibly have provided it on any loan applications he made in 2006. He contends that Ocwen obtained his cellphone number by a method known as skip tracing, whereby companies search credit histories and other public databases to obtain contact information for debtors listed on loan applications. Snyder also states that many of the calls used an artificial or pre-recorded voice. Snyder says that he never consented to being contacted by Ocwen at the 7690 number and that he e-mailed Ocwen in September 2014 to ask it to stop calling his cellphone. He says that he received at least three more calls to his cellphone following that e-mail.

In 1995, Mansanarez began renting a home in Washington, D.C., which she purchased in 2006. Around early 2014, Mansanarez received a letter from Ocwen informing her that it now possessed the servicing rights for her loan. She then began receiving phone calls from Ocwen on her cellphone, a number ending in 7110. Mansanarez alleges that Ocwen made many of these phone calls using an artificial or

3

pre-recorded voice. She further alleges that she repeatedly asked Ocwen to stop calling her cellphone. Mansanarez says that despite this request, Ocwen continued to call her cellphone and that she received hundreds of calls in 2014 and 2015. She also says that she asked an Ocwen employee during one of these calls why Ocwen continued to call her, and the employee replied that Mansanarez's phone number had been placed in Ocwen's automated calling system.

Snyder filed a class action complaint based on these phone calls in October 2014 and simultaneously filed motions to certify two classes, one based on claims under the TCPA and one based on claims under the FDCPA. Mansanarez later joined the suit as a named plaintiff, and the two filed a joint amended complaint in April 2015. Plaintiffs allege that Ocwen uses an automatic telephone dialing system at its call centers, as well as computerized account information to track, record, and maintain the debts that Ocwen services. Plaintiffs further allege that Ocwen uses skip tracing and ANI capture—a technique where Ocwen captures and stores the numbers of consumers who call the company—to gather borrowers' phone numbers (including cellphone numbers) and subsequently call them using the autodialer without the borrowers' prior express consent. Plaintiffs claim that Ocwen used this system along with artificial or pre-recorded voices to call them in violation of the TCPA. Plaintiffs also claim that Ocwen has used this practice with numerous other debtors and that it continues to engage in similar practices. Plaintiffs seek to represent a class defined as:

> All persons in the United States to whom: (a) Defendant and/or a third party acting on Defendant's behalf, made one or more non-emergency telephone calls; (b) to their cellular telephone number; (c) through the use of an automatic telephone dialing system or an artificial or prerecorded voice; and (d) at any time in the period that begins four years before the date of filing this Complaint to trial.

4

Plaintiffs also allege that this same conduct violates the FDCPA and seek to represent a separate class based on this claim. The FDCPA claims are not at issue in the present motion.

In December 2014, the parties stipulated to remove the motions for class certification from the Court's docket to allow for discovery on class issues, based on the understanding that Ocwen agreed "not to undertake any effort to 'pick off' the named plaintiff or plaintiffs." Dkt. no. 19 at 1. In September 2016, the Court granted Ocwen's motion to consolidate this case with one brought by another debtor, Tracee Beecroft, who alleges similar claims under the TCPA and the FDCPA.

In October 2016, plaintiffs filed the present motion requesting a preliminary injunction and certification of a limited class. In the motion, plaintiffs allege that Ocwen continues to use its autodialer—Aspect software—to make calls to consumers' cellphones without their consent. Pls.' Mem. in Supp. of Mot. for Prelim. Inj. and Ltd. Class Certif. (Pls.' Mem.) at 1. Plaintiffs ask the Court to preliminarily enjoin Ocwen from using Aspect software to place calls to "(1) cellular telephone numbers obtained via skip-tracing; (2) cellular telephone numbers obtained via ANI capture; and (3) cellular telephone numbers after verbal or written requests that calls to that number, account, or consumer stop, including but not limited to payment reminder calls." *Id*. Plaintiffs further ask the Court to order Ocwen to suspend its reminder call program. *Id*. at 2. Finally, they ask the Court to appoint a special master, at Ocwen's expense, to monitor the company's compliance with the order. *Id*. at 2. In order to effectuate this injunction, plaintiffs ask the Court to certify, under Federal Rule of Civil Procedure 23(b)(2), an injunctive relief class including:

> All persons called on a cellular telephone number by Ocwen, or a third party on its behalf, through the use of an autodialer, that Ocwen obtained via skip tracing or ANI capture, and / or after having provided a verbal or written request that calls to that number, account, or consumer stop, and / or who received a reminder call.

*Id*.

On April 3, 2017, the Court held an evidentiary hearing primarily focused on the issue of balance of harms, one of the factors considered when a party requests a preliminary injunction. The evidence garnered at that hearing also has implications regarding the other factors relevant to issuance of a preliminary injunction. The Court will discuss this evidence in greater detail later in this opinion.

## Discussion

A court may order injunctive relief under the TCPA when a plaintiff can show that the defendant made a call to plaintiff's cellphone using either an automatic telephone dialing system or an artificial or pre-recorded voice. 47 U.S.C. § 227(b)(1)(A)(iii) & (b)(3). In general, a preliminary injunction is an equitable remedy that is available "only when the movant shows clear need." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015). In order to award relief—such as a preliminary injunction—to an entire class of potential plaintiffs, a court must determine whether the class meets the requirements for certification under Federal Rule of Civil Procedure 23. *See Davis v. Hutchins*, 321 F.3d 641, 648 (7th Cir. 2003).

Ocwen raises a number of arguments in opposition to plaintiffs' request for limited class certification and a preliminary injunction. Ocwen first argues that the plaintiffs do not have standing to request an injunction. Ocwen then contends that the Court should not certify the proposed limited class because plaintiffs have failed to meet the requirements of Federal Rule of Civil Procedure 23(b)(2). Next, Ocwen disputes

6

plaintiffs' contention that this Court should apply a test that does not require a showing of irreparable harm in determining whether to grant an injunction. Finally, Ocwen argues that plaintiffs have failed to meet the standard—whatever it is—for granting injunctive relief.

## I.    Standing

"In order to invoke Article III jurisdiction a plaintiff in search of prospective equitable relief must show a significant likelihood and immediacy of sustaining some direct injury." *Sierakowski v. Ryan*, 223 F.3d 440, 443 (7th Cir. 2000). Past exposure to the defendant's allegedly illegal conduct is insufficient. *Id.* Instead, plaintiff must demonstrate "a real and immediate threat of repeated injury." *Palmer v. City of Chicago*, 755 F.2d 560, 571 (7th Cir. 1985). In other words, the plaintiff must show that the defendant's violation as to the particular plaintiff is likely to recur. This showing "must be premised upon more than hypothetical speculation and conjecture that harm will occur in the future." *Id.*

Neither Snyder nor Mansanarez faces a current threat of receiving calls from Ocwen that violate the TCPA. The company ceased calling Snyder immediately after he filed his initial complaint in October 2014, and Snyder does not contend that he is likely to receive calls in the future. Further, Mansanarez last received phone calls from Ocwen in May 2015. Pls.' Reply in Supp. of Mot. for Prelim. Inj. and Ltd. Class Certif. (Pls.' Reply), Ex. 2. Ocwen contends—and plaintiffs do not dispute—that it has updated its business records to reflect that Snyder and Mansanarez do not consent to receiving autodialed phone calls and therefore that they are not at risk of future harm by any calls alleged to violate the TCPA.

Plaintiffs have sufficiently shown, however, that other members of the proposed class continued to receive phone calls from the company even after Ocwen stopped making calls to Snyder and Mansanarez. Steve Bartolone states that he and his wife have been receiving calls to their cellphones from Ocwen since 2011, that he has repeatedly asked Ocwen to stop, and that he has received more than one call in the last twelve months. Pls.' Mem., Ex. 5 (Bartolone Aff.) ¶¶ 3–5, 12. Jonathan Cody likewise states that he never provided his cellphone number to Ocwen and yet has continuously received harassing phone calls. *Id.*, Ex. 6 (Cody Aff.) ¶¶ 2–3. Cody has repeatedly asked the company to stop making these phone calls but has continued to receive them over the last eighteen months, including as recently as September 21, 2016. *Id.* ¶¶ 3, 8–9. These contentions are disputed, but the Court need not resolve the disputes to determine the issue of standing. Plaintiffs have sufficiently shown that members of the proposed class face a real and immediate threat of receiving calls from Ocwen that allegedly violate the TCPA.

Ocwen argues that the threat of injury to members of the proposed class is irrelevant because courts must consider only whether the named plaintiffs have standing to sue. Def.'s Mem. in Opp'n to Pls.' Mot. for a Prelim. Inj. and Class Certif. (Def.'s Resp.) at 9. Ocwen essentially contends that the named plaintiffs' claim for a preliminary injunction are moot and this prevents them from pursuing injunctive relief on behalf of a class that has not yet been certified.

For the reasons discussed earlier, Ocwen is correct in arguing that the named plaintiffs' individual claims for prospective injunctive relief are moot. The Supreme Court has, however, recognized an exception to the mootness doctrine in the context of class

actions where it is "by no means certain that any given individual, would be [subject to the unlawful conduct] long enough for a district judge to certify the class." *Robinson v. City of Chicago*, 868 F.2d 959, 968 (7th Cir. 1989) (citing *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975)). The Supreme Court has recognized that when the time frame for the alleged injury is by nature temporary, a named plaintiff can continue to pursue the interests of the class even after his own claim has been rendered moot. *Gerstein*, 420 U.S. at 110 n.11. Otherwise, a defendant could evade prospective injunctive relief simply by inflicting harms that are too transitory to last the length of an entire lawsuit or, in this case, by ceasing the alleged violations with respect to plaintiffs who step forward. In order for this exception to apply, a court still requires the named plaintiff to have a live claim at the time that the complaint was filed. *See Sosna v. Iowa*, 419 U.S. 393, 402 (1975); *Robinson*, 868 F.2d at 968 ("[A] representative's claim must at least be live when he files the case.").

Plaintiffs here have met this exception to the mootness doctrine. At the time that Mansanarez joined this lawsuit, she possessed a live claim for prospective injunctive relief. Snyder filed the first complaint in this suit in October 2014, a time during which Mansanarez was still receiving phone calls from Ocwen. Pls.' Reply, Ex. 2. Mansanarez continued to receive phone calls even after she joined this suit as a named plaintiff and filed an amended complaint in April 2015. *Id.* Further, Marc Trees, the director of dialer and workforce management at Ocwen, says the company's records did not reflect plaintiffs' lack of consent to the phone calls until September 2016. Def.'s Resp., Ex. 1 (Trees Affid.) at ¶ 29. Prior to that date, Mansanarez faced an immediate threat of injury and continued to receive phone calls from Ocwen even after she joined

9

this lawsuit.  Further, Ocwen's primary contention that plaintiffs lack standing to obtain injunctive relief is that the company has stopped calling them since the lawsuit has been filed.  If this were sufficient to defeat standing, Ocwen would be able to cease calls to any individual the instant he joined the case as a named plaintiff and thereby indefinitely avoid injunctive relief, while keeping the allegedly unlawful practices in effect.  A defendant's choice to end the challenged behavior—where he remains free to resume the unlawful conduct at any time—is insufficient to render plaintiff's claim moot.  *See Ragsdale v. Turnock*, 841 F.2d 1358, 1364–65 (7th Cir. 1988) (noting that voluntary cessation of putatively illegal conduct ordinarily will not moot a controversy and that defendant bears a "heavy burden of persuading the court that a controversy is moot").  The Court concludes that plaintiffs may pursue claims for injunctive relief on behalf of a class.

## II.    Limited class certification

Plaintiffs ask the Court to certify a limited class for the purposes of granting a preliminary injunction.  Plaintiffs define the proposed class as:

> All persons called on a cellular telephone number by Ocwen, or a third party on its behalf, through the use of an autodialer, that Ocwen obtained via skip tracing or ANI capture, and / or after having provided a verbal or written request that calls to that number, account, or consumer stop, and / or who received a reminder call.

Pls.' Mem. at 2.  Ocwen primarily contends that plaintiffs cannot meet the requirements for certification under Federal Rule of Civil Procedure 23(b)(2).  Ocwen also makes two brief arguments that appear to address the way plaintiffs have defined the class.  The Court addresses the latter arguments first before turning to the standards for class certification.

### A.      Class definition

Ocwen first argues that plaintiffs are actually attempting to certify not a single class but four distinct subclasses:  (1) those whose numbers were found using skip-tracing; (2) those whose numbers were found using ANI capture; (3) those who gave their numbers to Ocwen but then withdrew consent for phone calls; and (4) those who have received a reminder call from Ocwen.  Def.'s Resp. at 3–4.  Ocwen argues that the Court must evaluate plaintiffs' request as one for four subclasses and that doing so will demonstrate that plaintiffs cannot meet the class requirements for each one.  *See* Fed. R. Civ. P. 23(c)(5) (subclasses are each treated as a class for Rule 23 purposes).

District courts have broad discretion in class certification, and there is no mandate to automatically subdivide classes.  *Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 940 (7th Cir. 2016).  The appropriate inquiry is "whether the class representative adequately represents class members' interests."  *Id.*

The Court finds that plaintiffs meet this standard for a single class and thus there is no need to certify subclasses.  Although plaintiffs' proposed class may include individuals whose numbers Ocwen discovered using different methods, all class members ultimately seek the same relief:  an injunction that prevents Ocwen from using an autodialer to call cellphone numbers without consumer consent.  Further, Ocwen's argument that the Court should consider certification of four distinct subclasses relies on its contention that the phone calls it made are easily grouped based on the method the company used to obtain the number (skip tracing, ANI capture, etc.).  But Ocwen has previously represented to the Court that the way it maintains its records makes it extraordinarily difficult and time-consuming to determine how the company obtained

11

each debtor's cellphone number. If one takes Ocwen at its word, then its argument for creating subclasses effectively would immunize it from certification of a class and, thus, from an injunction, thereby enabling it to continue any ongoing unlawful practices. Under the circumstances, Ocwen cannot appropriately argue that the Court should divide the class up in this way. Because all potential class members—including plaintiffs—have a similar interest against Ocwen, and Ocwen has not presented any evidence suggesting plaintiffs would be unable to adequately protect this interest, the Court declines to divide the class into subclasses. *See id.*

Ocwen also argues that part of plaintiffs' proposed class definition creates an impermissible "fail-safe" class and therefore that the Court should deny plaintiffs' request for certification. Def.'s Resp. at 25. A fail-safe class is "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 825 (7th Cir. 2012). Courts are concerned with class definitions that are written so that potential class members either fit the definition and therefore win their claim or, by virtue of losing, are defined out of the class and are not bound by the judgment. *See id.* Ocwen argues that plaintiffs have created such a class by defining the class in part as those consumers who have provided a verbal or written request that calls to their cellphones stop—i.e., those consumers who withdrew consent for autodialed phone calls. But as the Seventh Circuit has pointed out, defining a class to avoid the fail-safe pitfall is more of an art than a science, and problems that arise should most often be dealt with "by refining the class definition rather than by flatly denying class certification on that basis." *Id.* Given that the Court is considering certification for the limited purpose of granting a

12

preliminary injunction—and the potential difficulty of certifying any TCPA class if this definition is deemed a fail-safe class—the Court finds that plaintiffs' class definition does not so clearly present a fail-safe class as to justify denying certification or rewriting the limited class definition. Ocwen is free to renew this challenge when the Court considers class certification for the purposes of liability.

### B. Class certification

A court deciding whether to certify a class must first determine whether the class meets the requirements of Federal Rule of Civil Procedure 23(a). *Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 549 (7th Cir. 2016). Rule 23(a) requires that

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately represent the class.

Fed. R. Civ. P. 23(a). If the class meets this standard, a court must consider whether the class meets the requirements of one of the categories listed in Rule 23(b). *Phillips*, 828 F.3d at 544 n.3. Plaintiffs have requested certification of a class under Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *see also* Pls.' Mem. at 2.

### 1. Rule 23(a) requirements

Ocwen has not challenged plaintiffs' contention that they meet the numerosity and commonality requirements. For this reason, the Court considers these

13

requirements together and then evaluates typicality and adequacy of representation.

### a.  Numerosity and commonality

Under the numerosity requirement, a court can certify a class without first determining its exact size as long as it is reasonable to believe the class is large enough to make joinder impracticable.  *Chapman v. Wagener Equities Inc.*, 747 F.3d 489, 492 (7th Cir. 2014).  Plaintiffs have met this requirement.  Ocwen produced records of its outbound calls during the class period, and plaintiffs contend that these records show that Ocwen made over 146 million calls to 1.45 million unique telephone numbers.  Pls.' Mot. for Prelim. Inj., Ex. 3 (Ankcorn Affid.) ¶ 3.  Even if only a small fraction of these phone calls fall into the class described by plaintiffs, the class surely meets the numerosity requirement.  Ocwen does not argue otherwise.  *See* Def.'s Resp. at 22.

To demonstrate commonality, "a prospective class must show that its claims depend upon a common contention of such a nature that it is capable of classwide resolution."  *Phillips*, 828 F.3d at 550 (internal quotation marks omitted) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  Plaintiffs contend there are at least three common questions:  (1) whether Ocwen's practice of using an automatic dialer to call cellphone numbers obtained via skip-tracing violates the TCPA; (2) whether Ocwen's practice of using an automatic dialer to call cellphone numbers obtained via ANI capture violates the TCPA; and (3) whether Ocwen has used an automatic dialer to call cellphone numbers after consumers withdrew their consent to be contacted.  Pls.' Mem. at 18–19.  The Court agrees with plaintiffs that its class presents common questions, resolvable "in one stroke," regarding whether Ocwen's practices and use of the Aspect software violate the TCPA.  *See Phillips*, 828 F.3d at 550.  Again, Ocwen

14

does not argue otherwise. The Court therefore finds that plaintiffs have met the numerosity and commonality requirements for certification of their limited class.

### b. Typicality and adequacy

Ocwen challenges plaintiffs' proposed class on the grounds of typicality and adequacy of representation. A plaintiff's claim is typical if it arises from the same event, practice, or course of conduct that gives rise to the claims of other class members and is based on the same legal theory. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006). In order for a plaintiff to be an adequate representative for the class, his claims must not be antagonistic to or conflict with those of the class. *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). Courts are particularly concerned with whether the named plaintiff is properly incentivized to pursue issues significant to members of the class. *See Robinson v. Sheriff of Cook Cty.*, 167 F.3d 1155, 1157 (7th Cir. 1999). The Seventh Circuit has noted that in many cases "the requirement of typicality merges with the further requirement that the class representative will fairly and adequately protect the interests of the class." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011) (internal quotation marks omitted).

Plaintiffs have satisfied both the typicality and the adequacy of representation requirements for class certification. Plaintiffs' claims arise from the same practice or course of conduct that gives rise to the claims of the proposed class members—namely, that Ocwen's use of an autodialer to make phone calls to consumers who have not consented violates the TCPA. Plaintiffs do not have interests that conflict with those of the other class members, as both named plaintiffs and the class seek to end Ocwen's practice of using the Aspect software to call consumers on their cellphones without their

consent. Further, the typicality and adequacy requirements are ultimately intended to address the concern that a plaintiff seeking damages might agree to a settlement of his own claims in exchange for selling out the other class members. This concern is minimized here, where plaintiffs are seeking class certification in order to obtain a preliminary injunction.

Ocwen argues that plaintiffs' claims are not typical of the class claims because they are not at risk of receiving future phone calls from Ocwen, even if other members of the class might be. Def.'s Resp. at 22–23. In doing so, Ocwen returns to its argument on mootness. But the Supreme Court in *Sosna* demonstrated that the mere fact that a named plaintiff's claim is moot does not prevent a finding that he is an adequate representative of the class. *Sosna*, 419 U.S. at 403 (finding it "difficult to imagine" why anyone in the class would have an interest adverse to that pursued by the named plaintiff despite the fact that his claim was moot). The Seventh Circuit has indicated in one instance that although "the mootness of a plaintiff's claim does not automatically disqualify him from serving as a class representative . . ., it makes him presumptively inadequate . . . unless the defendant is executing a strategy of buying off class representatives." *Culver v. City of Milwaukee*, 277 F.3d 908, 912 (7th Cir. 2002) (citing *Sosna*, 419 U.S. at 401). As discussed earlier, however, it is plausible that Ocwen might effectively pick off class representatives by ceasing calls to those individuals named as plaintiffs in this suit. Further, the Court in *Culver* noted that once the claim of the named plaintiff in that case became moot, he subsequently lost *any* material stake in prosecuting that particular suit. *Culver*, 277 F.3d at 912. That is not the case here, where both Snyder and Mansanarez maintain interests in pursuing

16

statutory damages under the TCPA and therefore remain highly incentivized to pursue their claims. The Court therefore finds that plaintiffs have met the requirements for class certification under Rule 23(a). The Court also recommends that plaintiffs consider adding one or both of the affiants discussed in this opinion (Bartolone and Cody) as another named plaintiff in order to avoid potential mootness concerns in the future.

### 2. Rule 23(b)(2) requirements

In order to certify a class under Rule 23(b)(2), plaintiff must show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Plaintiffs have sufficiently demonstrated that Ocwen's allegedly unlawful conduct affects the class as a whole. Plaintiffs have provided evidence that they and other class members received calls from Ocwen using the Aspect software. Plaintiffs offer evidence that they either never gave their cellphone numbers to Ocwen or that they withdrew consent to receiving autodialed phone calls, and yet continued to receive phone calls. Either situation—if proven to be true—constitutes a violation of the TCPA. Plaintiffs have therefore met the requirement for certification under Rule 23(b)(2).

Ocwen argues that the class definition is overly broad and encompasses consumers who have not received the same treatment as plaintiffs. Ocwen points to the affidavit of Sherri Goodman, its senior vice president of Ocwen's contact center operations. Goodman says that when Ocwen acquires numbers via skip tracing or ANI capture, it first calls these numbers manually instead of with Aspect software. Def.'s Resp., Ex. 3 (Goodman Affid.) ¶ 11. Ocwen does not use Aspect software to contact

these individuals until it has made contact with them and they have consented to receiving autodialed phone calls at their phone number. Ocwen therefore argues that not every call made to phone numbers found through this method is made both with an autodialer and without the consumer's consent, as required for liability under the TCPA. Def.'s Resp. at 24.

The Federal Communications Commission (FCC), however, recently issued an order in which it indicated that any system that has the capability of autodialing phone numbers, even when used in manual mode, qualifies as an autodialer under the TCPA. *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C.R. 7961, 7971–78 (2015). And Goodman acknowledges that Ocwen's Aspect software is an "autodialer [which] allows Ocwen to contact many more borrowers" than it would be able to with manual calls. Goodman Affid. ¶ 14. Therefore any phone call made using this software—even those dialed manually—could lead to liability under the TCPA. Thus the class definition is not overly broad.

Ocwen argues that this Court should ignore the FCC's guidance on this issue from its 2015 order, both because it exceeds Congress's intent in passing the TCPA and because there is a case pending in the D.C. Circuit regarding whether the FCC exceeded its authority in its 2015 order. Def.'s Sur-Reply in Further Opp'n to Pls.' Mot. for a Prelim. Inj. and Ltd. Class Certif. (Def.'s Sur-Reply) at 10–13. Regardless of whether this Court agrees with Ocwen's interpretation of congressional intent, final orders issued by the FCC are binding on this court under the Hobbs Act, 28 U.S.C. § 2341(1). *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 605 F.3d 443, 450 (7th Cir. 2010). Thus the Court must adhere to the FCC's 2015 ruling so long as it is valid law. The

18

Court also denies Ocwen's request to stay this motion until a ruling in the D.C. Circuit case is handed down, for the same reasons as it previously denied this request. *See* dkt. no. 182. The Court therefore applies the FCC's definition of an autodialer and finds that Ocwen has acted on grounds that apply to the whole class so as to make certification under Rule 23(b)(2) proper.

The Court will, however, defer entry of an order certifying a class until certain points addressed in the "Injunctive Relief" section of this opinion are resolved.

## III. Preliminary injunction

Finally, the Court reaches the issue of whether the certified class meets the standard for a preliminary injunction. The parties dispute both the standard that the Court should apply and whether the class has met either standard.

### A. Standard

Plaintiffs' contend that the Court must apply the "statutory" standard for a preliminary injunction, which does not require a plaintiff to show irreparable harm. Pls.' Reply at 5–8. Ocwen argues that the traditional four-factor test applies. Def.'s Resp. at 13–18.

Injunctions typically do not issue as a matter of course but are available as equitable remedies according to the court's discretion. *Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 842 (7th Cir. 2005). "[U]nless a statute clearly mandates injunctive relief for a particular set of circumstances, the courts are to employ traditional equitable considerations (including irreparable harm) in deciding whether to grant such relief." *Id.* at 843 (interpreting the test established in *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982)). The statutory test applies only when the statute expressly, "or by a necessary

and escapable inference, restricts the court's jurisdiction in equity." *Bedrossian*, 409 F.3d at 842–43.

The TCPA provides that a private citizen may bring "an action based on a violation of [the TCPA] to enjoin such violation." 47 U.S.C. § 227(b)(3)(A). This is the only language that plaintiffs point to when arguing that the TCPA restricts this Court's jurisdiction in equity. This language, however, does not support an inescapable inference that Congress intended for plaintiffs under the TCPA to obtain preliminary relief without showing irreparable harm. *See Bedrossian*, 409 F.3d at 843. Congress's goal in enacting the TCPA was to provide a mechanism by which private citizens might successfully challenge corporate practices that invade their privacy in instances in which it is otherwise difficult to prove actual damages. *See Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1050 (7th Cir. 2013). The inference that injunctive relief is required to accomplish this goal is not "necessary and inescapable." *See Bedrossian*, 409 F.3d at 844. This is particularly true given that Congress authorized private individuals to bring suits based on violations of the TCPA for either (1) an injunction; (2) statutory damages in the amount of $500—$1,500 if the defendant acted willfully; or (3) both. *See* 42 U.S.C. § 227(b)(3). Thus Congress seems to have determined that an award of statutory damages on its own would be sufficient to both compensate plaintiffs and deter future violations.

Courts have applied the statutory injunction test only in a limited number of cases, none of which support applying that same test to the TCPA. In *TVA v. Hill*, 437 U.S. 153 (1978), the Supreme Court applied the statutory test when it found that Congress's "plain intent" in enacting the Endangered Species Act "was to halt and

20

reverse the trend toward species extinction, *whatever the cost*" and that this was reflected "in literally every section of the statute." *Id.* at 184 (emphasis added). Plaintiffs have failed to show that the TCPA demonstrates the same refusal to balance relative harms. In another case, the Supreme Court applied the statutory test to a provision of the Labor Management Relations Act due in part to the fact that the statute authorized injunctions in situations where a strike imperiled national health and safety. *See United Steelworkers of Am. v. United States*, 361 U.S. 39 (1959); 29 U.S.C. § 178(a)(ii). The threats posed by violations of the TCPA are not so grave as to justify similar treatment. Finally, plaintiffs point to *CFTC v. Hunt*, 591 F.2d 1211 (7th Cir. 1979), in which the Seventh Circuit applied the statutory test to a request for an injunction under the Commodity Exchange Act. *Id.* at 1219. That statute, however, specifically provides that "[u]pon a proper showing, a permanent or temporary injunction or restraining order *shall be granted* without bond." 7 U.S.C. § 13a-1(b) (emphasis added). The TCPA does not contain any similar mandatory language.

The Court therefore applies the traditional equitable test to determine whether the limited class is entitled to an injunction.

**B.    Injunctive relief**

In order to obtain a preliminary injunction, plaintiffs must show that (1) they have some likelihood of success on the merits; (2) there is no adequate remedy at law; and (3) they will suffer irreparable harm if the Court denies the request. *See Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012). If plaintiffs meet these requirements, the Court weighs the harms plaintiffs will suffer if the Court denies the injunction against the harms Ocwen will suffer if it grants the injunction, and also

considers the public interest. *See id.*

### 1. Sheri Goodman's affidavit and testimony

The Court returns at this point to the evidence, focusing specifically on the affidavit of Sheri Goodman and her testimony at the hearing on April 3, 2017.

As discussed earlier, Ocwen services mortgage loans. The loans are ultimately pooled in trusts, which in turn contract with Ocwen to service the loans. As of December 2016, Ocwen was servicing 1.4 million mortgage loans.

Ocwen makes what plaintiffs refer to as "reminder calls" to borrowers who are late in making payments, estimated at about twenty percent of its borrowers. It also makes calls to inform borrowers about steps to avoid foreclosure.

Plaintiffs' request for a preliminary injunction focuses on three aspects of Ocwen's telephone communications with borrowers. The first involves calls to borrowers at phone numbers provided not by the borrower but instead obtained by Ocwen via what it calls "skip tracing" or "ANI capture." The second involves calls made by Ocwen after an objection by the recipient that Ocwen considers insufficient to revoke prior consent to receive calls. The third involves the "reminder call" program generally.

Ocwen maintains information regarding borrowers, including contact information, in a computerized database called REALServicing. With regard to a particular borrower, for each telephone number listed in REALServicing, the system includes a field stating whether the number is understood to be a cellphone or a landline. Goodman Affid. ¶ 10. Goodman, who is in charge of Ocwen's call center operations, says that the first call Ocwen makes to a phone that it knows is a cell phone is always a manually-dialed call from a Cisco phone or a Cisco application on the Ocwen

representative's computer. *Id.* ¶ 11. Goodman says that Ocwen's call center procedures require the company's agents to ask the borrower "for consent to call his or her cell phone with Ocwen's automated phone system, if this consent is not already noted in REALServicing. If a borrower consents to being called on his or her cellphone with this system, Ocwen may subsequently use an autodialer to call that borrower." *Id.* ¶ 12. As indicated earlier, Ocwen uses an autodialer system called Aspect.

Turning to the relevant law briefly, the TCPA makes it illegal to, among other things, use an automatic telephone dialing system to call a cell phone number, unless the call is for emergency purposes or the caller has the prior express consent of the called party. 47 U.S.C. § 227(b)(1)(A)(iii). Prior express consent is an affirmative defense on which the defendant bears the burden of proof. *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* (FCC Order 2008), 23 F.C.C.R. 559, 564–65 (2008); *see also Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017); *Evankavitch v. Green Tree Servicing, LLC*, 793 F.3d 355, 366 (3d Cir. 2015); *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1115 (11th Cir. 2014).

Ocwen contends that it does not make calls using the autodialer to a borrower's cellphone unless it has the borrower's prior consent. Proving this, however, is a different matter. Ocwen has, throughout this litigation, consistently maintained that the presence or absence of consent may only be determined on an individual basis, and then only by manual review of records relating to the particular borrower. This is partly a function of how Ocwen has chosen to keep records and partly a function of the fact that the company obtains phone numbers in different ways and does not necessarily

know at the outset whether a number is a landline or a cellphone number. This can happen for any of at least three reasons. First, the number may have been a landline number already in Ocwen's database, but the borrower later "ported" the number to a cell phone. Second, the number may be one that Ocwen obtained from a source other than the borrower, "skip tracing" in Ocwen lingo. Third, the number may have been a number from which the borrower contacted Ocwen, which captured the number via ANI capture (automatic number identification), a form of caller ID.

Prior to March 2014, Ocwen did not have any systematic way to determine whether the phone number listed in its system for a borrower was a cellphone number. As just indicated, numbers are obtained by different means and entered into REALServicing at different times, and Ocwen had not set up the database to require identification of how a particular number was obtained. In addition, Ocwen was not regularly reviewing its database to determine whether numbers were correctly designated as cellphone numbers or landline numbers.

Starting in April 2014, shortly after Goodman joined Ocwen, the company instituted a procedure by which, at least on a weekly basis, it compared the borrower phone numbers in its data base with data from areacode.com, a publicly available website that purports to be able to identify cellphone numbers. If this resulted in information that any particular number was a cellphone number, Ocwen would change the number's designation in the REALServicing system to reflect this. Goodman Affid. ¶ 17. There were, however, at least two flaws with this procedure. First, the areacode.com database was not entirely accurate. Among other things, the database did not identify as cellphone numbers phone numbers that originated with a landline but

24

were later ported to a cellphone. (Ocwen later switched to a database called Neustar, which it says is far more accurate.) Second, at the time, Ocwen did not have a field in its database signifying whether the borrower had consented to calls on his cellphone generally or on the particular phone number entered in the database. Thus when a new number was entered into REALServicing, there was no "reset" on the question of consent for the particular borrower.

In December 2014—not too long after the present lawsuit was filed—Ocwen added a field to the REALServicing database to record consent for TCPA purposes, that is, consent to calls using an autodialer to the borrower's cellphone. *Id.* ¶ 18. This field provides three alternatives for the Ocwen agent to set—yes (Y), no (N), or pending (P). Goodman says that the field was initially set to P for all borrowers. *Id.* Goodman's affidavit implies, though it does not specifically state, that no calls using the autodialer would be made to any borrower whose field was not set to Y. *See id.* ¶ 19 ("The consent field . . . determines whether a borrowers' [sic] cell phone number will be autodialed; if the flag is not set to Y, the number is not added to the list of numbers that are loaded into the autodialer."). If this is what Goodman means by her affidavit, it is rather hard to believe. She seems to be saying that when the consent field was added to REALServicing in December 2014, the consent flag was set to P (pending) for all borrowers, and as indicated her affidavit suggests that no calls using the autodialer are made to a particular borrower unless her consent flag is set to Y (yes). If this is so, it would suggest that Ocwen's autodialing program came to a complete, grinding halt in December 2014 when all of the consent flags were set to P and was resumed only gradually, as manually-dialed confirmatory calls were made and consenting borrowers'

25

status was reset from P to Y.  But Goodman's affidavit does not say, nor does it suggest, that there was any such hiatus in autodialing.  Nor did Goodman give any hint of anything like this in her testimony at the April 3 hearing.  Thus it may not have happened that way:  it is difficult to imagine Ocwen making 1.4 million manually-dialed calls, or even twenty percent of that number—280,000—to confirm each borrower's or each delinquent borrower's consent status.[1]  Getting to the bottom of this may be a significant issue, at least for another day.

As indicated earlier, one of the key issues on the preliminary injunction motion involves numbers that Ocwen obtains for a borrower after it has already begun servicing the borrower's loan.  When Ocwen determines that all of the phone numbers it has for a borrower are incorrect or disconnected, the account is transferred to the company's skip tracing team.  *Id.* ¶ 35.  A skip tracer consults data sources to obtain a current phone number for the borrower.  According to Goodman, once a number is obtained, a manual call is made to verify the number.  If the Ocwen representative reaches the borrower live and obtains confirmation that this is the borrower's number, or hears a voice mail message including the borrower's full name, the number is considered confirmed, and it is added to the borrower's account in REALServicing.  *Id.* ¶ 36.

But up until December 2016—after plaintiffs' preliminary injunction motion was filed—this process of obtaining and adding numbers via skip tracing did not result in any change to the borrower's consent status in the REALServicing database.  Apr. 3, 2007

---

[1] Based on Goodman's statement that a representative is capable of making 20-25 manual calls per hour, making 280,000 manual calls to obtain or confirm consent would have required over 11,000 person-hours, completely apart from any regular servicing calls Ocwen made.  And this is the *minimum* number; it assumes that every borrower picks up on the first call, which is highly unlikely.

Hrg. Tr. at 22, 39.  As a result, it is undisputed, or at least not reasonably disputable, that there are some borrowers whose consent status was previously set as Y (yes), who later had a cellphone number added via skip tracing, but whose consent status remained set as Y despite the fact that the borrower had not consented to calls on the newly-added phone (or, perhaps, for calls on cellphones, period).  *See id.* at 22, 39, 41-42.  Borrowers in this scenario would have been "eligible" to receive calls placed via an autodialer to their cellular phones despite the absence of consent.

In December 2016, Ocwen instituted a procedural change that it contends resolves this problem, at least going forward.  Now, when adding to an account a phone number obtained from skip tracing, the Ocwen agent is directed to change the consent flag to N (no).  *See id.* at 20-21; Hrg. Ex. 1.  This, Goodman says, prevents autodialed calls to that number unless and until consent is obtained via a manually-dialed call.

Also at issue on the preliminary injunction motion is Ocwen's use of phone numbers obtained via ANI capture, which occurs when a borrower calls Ocwen.  Goodman Affid. ¶ 40.  This number is then recorded in REALServicing.  According to Goodman's affidavit, a skip tracing agent then will place a manual call to the number and will attempt to obtain consent for calls at that number, and will change the consent flag accordingly.  *Id.* ¶¶ 40-41.  It is unclear to the Court whether the just-described procedure of resetting the consent flag to N applies to numbers obtained via ANI capture.

Unfortunately, Ocwen has not included in REALServicing a field that permits identification of how a particular telephone number was obtained, or more specifically whether a particular number was obtained via skip tracing or ANI capture.  For such

27

numbers, however, the comments section of the REALServicing file often will bear the notation NVLS, which is Ocwen-speak for a non-voice-located number (i.e., a number obtained by some means other than the borrower himself).  Notations in the comments, however, are the type of information that Ocwen has contended require a manual, borrower-by-borrower search of its records.

The December 2016 change, requiring reset of the consent flag to N when a new number is obtained via skip tracing, seems geared to minimizing, for numbers obtained after that date, the risk that an autodialer will be used to make calls to a cellphone number that Ocwen obtains that way.  Thus, going forward, the problem calls made with an autodialer to cellphone numbers obtained via skip tracing or ANI capture appears to be limited to numbers that were obtained before the December 2016 procedure change. For borrowers with those numbers, the evidence shows that they *are* still at risk of getting calls using an autodialer.  As indicated earlier, Goodman conceded at the hearing that where a number on a borrower's account was obtained via skip tracing or ANI capture before December 2016 and the consent flag was previously set to Y (yes), the flag would have not been changed.

The other primary point at issue on the preliminary injunction motion concerns borrowers who claim to have revoked their previous consent to be called on a cellphone.  In her affidavit, Goodman states that since September 2016, Ocwen representatives have been under directions to change the consent flag for the borrower to N (no) if the recipient of a call asks not to be called, irrespective of whether the borrower "authenticate[s] his or her identity."  *Id.* ¶ 25.  Before that, she stated, the company "required authentication that the recipient of the call was in fact the borrower,

before making such a change to the account status." *Id.* At the hearing, Goodman elaborated on this. She said that prior to September 2016, if a call recipient simply said "stop calling me" but did not identify the number as a cellphone number, or did not specifically identify himself by name, then agents were told *not* to change the consent flag to N. Apr. 3, 2017 Hrg. Tr. at 52-54.

The September 2016 policy change just referenced also requires Ocwen representatives to make a notation on any account where the call's recipient "believes he or she is being contacted in error." Goodman Affid. ¶ 25. Numbers that are flagged this way "are automatically excluded from any dialing campaigns on the autodialer," according to Goodman. *Id.*

Finally, plaintiffs also ask the Court to shut down Ocwen's "reminder call" program. But they have not identified anything inherently illegal about that program. Rather, any concerns appear to arise from the same issues just discussed: using an autodialer to call borrowers on cell phones for which they have not provided consent, or for which they have revoked consent.

## 2. Likelihood of success

To establish the requisite likelihood of success on the merits, a plaintiff is required to show only that he has a "better than negligible" chance of success on the merits of at least one of his claims. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1096 (7th Cir. 2008). As indicated earlier, to prove liability under the TCPA, a plaintiff must show that the defendant called plaintiff's cellphone using an automatic dialer. 47 U.S.C. § 227(b)(1)(A)(iii).

Plaintiffs have provided substantial evidence—including records from Ocwen

itself—that they received calls from Ocwen on their cellphones. Ocwen essentially concedes that it makes thousands upon thousands of calls using an autodialer, and it does not seriously dispute that many of these are calls to cellphones. And Goodman acknowledges that Ocwen's Aspect software is an "autodialer [which] allows Ocwen to contact many more borrowers" than it would be able to with manual calls. Goodman Affid. ¶ 14. Plaintiffs have no difficulty establishing a prima facie case of liability.

Ocwen argues that plaintiffs have failed to demonstrate a likelihood of success because they have not shown they did not consent to the phone calls. But as indicated earlier, a plaintiff is not required to negate consent to establish a prima facie case of liability under TCPA. Rather, consent is an affirmative defense on which defendant bears the burden of proof. *Supra* at 23.

Ocwen will have a very difficult time establishing consent. This is partly because it has chosen to keep its records in a way that (it contends) requires individual examination of the details of each particular borrower's account to assess whether there was valid consent, rather than keeping a database that is searchable for this information.

That aside, there are problems with the consent defense in two significant areas addressed in the parties' preliminary injunction submissions and at the hearing. First, as discussed earlier, it is highly likely that there are a significant number of class members for whom Ocwen obtained a cellphone number by skip tracing or ANI capture prior to December 2016 but for whom the "consent" flag was not reset to N (no). Based on Goodman's testimony at the hearing, these borrowers are eligible to get calls placed using an autodialer despite the absence of consent.

30

Second, it is highly likely that there are a significant number of class members who took steps sufficient to withdraw any previous consent but who are still reflected in Ocwen's records as having consented to calls to their cellphones via an autodialer. Ocwen's lawyer argued at the hearing that the company's process regarding revocation of consent "is as good as it can be at this point." Ocwen's current practice is, to be sure, better than it was. Goodman states in her affidavit that as of September 2016, if a borrower says "stop calling me" and hangs up, the Ocwen representative must now set the consent flag to N (no), and calls placed with an autodialer are not permitted until fresh consent is obtained. But Ocwen's database still includes borrowers who did exactly this in August 2016 or earlier but whose consent flags remain set to Y (yes). The reason for this is that Ocwen essentially ignored "stop calling me" requests unless the borrower said certain magic words—including "on my cellphone" and some verification of his identity. But the borrower would have no way of knowing this, and in any event plaintiffs have a reasonable likelihood of establishing that the "magic words" requirement was an inappropriately high hurdle. Ocwen's contention that it needed this information to verify that it was talking to the borrower does not withstand serious scrutiny. What we are talking about here is a phone number that Ocwen considered good enough to list in its database as the borrower's phone number and therefore good enough as the target of a manual or autodialed call. If the number was good enough for these purposes, there is no legitimate reason why a statement by the person who picks up on that same number to "stop calling me" ought not be good enough to revoke consent under the TCPA. And the proposition that the borrower had to use the phrase "on my cellphone" makes no sense at all as a prerequisite for an adequate revocation of

31

consent. Essentially this would require the borrower to do what should have been

Ocwen's job in the first place in light of the TCPA's prohibitions, specifically, identifying

whether a phone number it is calling is a cellphone or a landline. In sum, plaintiffs have

shown a reasonable likelihood of success even with regard to Ocwen's consent defense

given the likely inappropriate practice the company followed with regard to consent

revocation.

With regard to the reminder call program generally, as indicated earlier plaintiffs

have not offered evidence suggesting that this program is inherently unlawful. They

have not, at this point, shown a reasonable likelihood of success on any claim attacking

the reminder call program as such.

### 3. Adequate remedy

For plaintiffs to show that they lack an adequate remedy at law, they must show

that a damages remedy would be "seriously deficient as a remedy for the harm

suffered." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984).

An award of damages may be inadequate if the defendant is likely to become insolvent

before a final judgment can be entered and collected. *Id.* Ocwen itself has stated that it

"has never had the ability to pay even a small fraction" of the amount of statutory

damages that would be awarded to the class if it succeeds on the merits of its TCPA

claims. Def.'s Mem. in Opp'n to Pls.' Mot. to Amend Their Compl. to Add Trustee Defs.

at 1. Based on this statement and similar representations Ocwen has made to the

Court, the Court finds that plaintiffs have shown there is no adequate remedy at law for

any future violations of the TCPA committed by Ocwen against the members of the

limited class, even assuming that the limited class for injunction purposes is only a

portion of the class proposed for litigation. Ocwen argues that it has the ability to satisfy an award of damages on the claims of the named plaintiffs alone and that this should be sufficient to show an adequate remedy at law. But because the Court has granted plaintiffs' motion to certify a limited class, it must consider harm to the class as a whole and not just to named plaintiffs. Therefore Ocwen's ability to pay named plaintiffs is insufficient to demonstrate the existence of an adequate remedy at law.[2]

### 4. Irreparable harm

Irreparable harm is defined as harm to plaintiff that cannot be fully rectified by final judgment after trial. *Stuller*, 695 F.3d at 680. The Court's determination that Ocwen's conduct poses a risk of irreparable harm is tied to its conclusion that plaintiffs lack an adequate remedy at law. As discussed earlier, the language of the TCPA indicates that Congress viewed either statutory damages or an injunction as an appropriate remedy for violations, perhaps suggesting that these statutory damages can fully rectify the harm to plaintiffs' privacy interests. But because it is unlikely that Ocwen would be able to afford to pay statutory damages to the limited class, these class

---

[2] The Court also notes that plaintiffs have provided evidence that members of the class fall into the categories covered by the proposed injunction. Bartolone states in his declaration that Ocwen has repeatedly called his cellphone number within the last few years despite the fact that he never consented to such phone calls. Bartolone Affid. ¶ 4. He states that he repeatedly asks Ocwen to stop calling but, even when he speaks to a representative and explains that he has already made payments, the calls do not stop. *Id.* ¶¶ 5–9. Bartolone appears to be one of those individuals whose phone number was located via skip tracing (or perhaps ANI) and added to Ocwen's system prior to December 2016 and whose attempt to revoke any prior consent was dishonored. The same is true for Cody, who states that he got rid of a cellphone number ending in 9346 due to Ocwen's harassment. Cody Affid. ¶ 2. He acquired a new phone number ending in 9007, which Ocwen somehow obtained and has been using to contact him using autodialed calls. *Id.* ¶¶ 2–5. He has also had conversations with representatives and asked that they stop calling, to no avail. *Id.* ¶¶ 5–7.

members would suffer irreparable harm to their privacy interests should Ocwen continue to contact them using unlawful means.

In arguing that plaintiffs have failed to show irreparable harm, Ocwen again focuses solely on the risk of injury to the named plaintiffs. Ocwen argues that because neither Snyder nor Mansanarez is at risk of receiving phone calls in the future, they cannot possibly suffer irreparable harm. But again, the Court must consider the interests of the entire limited class, and plaintiffs have introduced evidence that other class members are at risk of receiving calls from Ocwen in the future.

The Court therefore finds that plaintiffs have demonstrated a likelihood of success on the merits, a lack of an adequate remedy at law, and irreparable harm sufficient to justify a preliminary injunction.

### 5. Balance of harms

Because plaintiffs have made the initial showing required for a preliminary injunction, the Court next weighs "the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Girl Scouts*, 549 F.3d at 1086. Ocwen argues in its brief that it would suffer severe hardship if the Court were to grant the injunction. Def.'s Resp. at 19–20. Goodman states in her declaration that an injunction would handicap Ocwen's mortgage servicing business and burden investors. Goodman Affid. ¶ 44. She also states that an injunction would harm other borrowers because Ocwen lacks the capacity to call them manually to discuss loss mitigation options. *Id.* Goodman estimates that Ocwen would need to hire approximately 1,500 additional call center representatives to make phone calls manually

instead of with the Aspect software, costing Ocwen $25 million annually.  *Id.* ¶ 45.

Goodman's estimate assumes that a preliminary injunction would directly or indirectly require Ocwen to cease use of the Aspect autodialer.  If so, Ocwen's argument that the balance of harms tilts toward denial of the motion would have significant force.  On one side of the ledger is the degree of future hardship to the plaintiff class if no preliminary injunction is entered.  As a result of the changes that Ocwen instituted in December 2016, no borrower with a cell phone number added to the company's records as a result of skip tracing or ANI capture should get a call made with an autodialer, at least if the company's procedures work correctly.  And Ocwen's September 2016 changes regarding when it honors an apparent revocation of consent arguably go a good deal of the way to solving that particular problem on a going-forward basis.  In both of these categories, the number of victims of TCPA violations is limited to some extent and likely to dwindle over time as a percentage of Ocwen's overall caseload.  On the flip side of the ledger, the expense and disruption caused by a complete shutdown of Ocwen's use of the autodialer might well outweigh the harm to the class from denial of a preliminary injunction.  And although the Court might not be imposing an injunction that directly tells Ocwen, in so many words, to stop using an autodialer, that would be the likely effect of an order that essentially precludes use of an autodialer without a fresh consent by each borrower.

On the other hand, it is not yet entirely clear to the Court whether an effective shutdown is the only feasible way to address the lingering problems arising from numbers obtained from skip tracing or ANI capture.  It appears that there are measures that can be employed in order to, if nothing else, quantify the problem and determine

whether a more targeted remedy is feasible. Although Ocwen has contended that a manual, borrower-by-borrower record search is required to identify borrowers whose numbers were obtained via skip tracing or ANI capture, that may not be entirely accurate. The Court asked Goodman at the hearing whether it would be possible to write a "script"—that is, a command in computer code—that would extract files in which the comments section of REALServicing reflects that a number was obtained by NVLS (Ocwen lingo for non-voice-located numbers). Goodman unhesitatingly and unequivocally said yes. Apr. 3, 2017 Hrg. Tr. at 65. One might assume that this would result in identification of less than 100% of all borrowers with numbers obtained via skip tracing or ANI capture, but it likely would be close enough. And it would enable a more solid determination of whether a targeted preliminary injunction to preclude further "built-in" TCPA violations involving those borrowers is feasible.

Second, on a going-forward basis, the Court is considering requiring Ocwen to add to the REALServicing database a field for the means by which a number was obtained (e.g., borrower's application, skip tracing, ANI capture, etc.). This would enable immediate retrieval of this information for a particular borrower without the need to search the whole "comments" file and would also enable searching the entire database of borrowers. It likely would also serve to deter or prevent future TCPA violations. The Court's order at the end of this opinion will require Ocwen to report on the feasibility of this as a remedy.

With regard to the revoked consent issue, the problem is that Ocwen's procedures, prior to the September 2016 change, leave open the possibility that many borrowers may have attempted to revoke consent in a way that Ocwen inappropriately

36

rejected.  The Court is unaware of any feasible means of identifying all such borrowers.  Thus an injunction barring calls with an autodialer to borrowers who attempted to revoke consent likely would require a shutdown of use of the autodialer until fresh consent was obtained, an over-inclusive remedy.  This might tip the balance of harms against entry of an injunction.  A forward-looking fix, however, is less problematic.  The Court believes there may yet be gaps in Ocwen's relatively new policy regarding recognition of revocation of consent.  The Court will require establishment of an ironclad procedure that requires Ocwen to set the consent flag back to N (no) any time a call recipient says anything at all similar to "stop calling," "don't call me," "I don't want your calls," "leave me alone," etc.[3]

### 6.    Public interest

Plaintiffs argue that the public interest supports an injunction because the public will benefit from an injunction against violations of the TCPA.  Ocwen argues that the requested injunction is overly broad and will prevent callers who have consented to receiving autodialed phone calls from receiving them.

The Court finds that this factor does not weigh particularly strongly in favor of either party.  Plaintiffs are correct that an injunction prohibiting unlawful conduct is generally in the public interest, but not where the injunction sweeps too broadly and prevents otherwise desirable conduct from taking place.  On the other hand, Ocwen's assertion of the potential harm to consenting borrowers is overstated, at least if the remedy is limited as the Court has discussed.

---

[3] The Court does not rule out the possibility that Ocwen may be able to persuade the Court that its current policy is sufficient.  So far, however, Ocwen has not attempted to describe or document the existing policy in detail in its submissions to the Court.

**Conclusion**

Plaintiffs have established the basis for certification of a limited class under Federal Rule of Civil Procedure 23(b)(2) and an entitlement to at least some of the preliminary injunctive relief they seek. But more work is required before the Court can finalize a class certification order or an appropriate preliminary injunction order. By no later than July 10, 2017, Ocwen is directed to file a report, supported by affidavits, including the following:

- A description of how Ocwen will go about conducting a search for the files of borrowers that reflect a phone number having been obtained by NVLS (as described earlier in this opinion), including how long it will take to conduct the search and the type of information that the search will report.

- A description of the feasibility, cost, and time needed to add a field to the REALServicing database that would identify the means by which any particular number for a borrower was obtained.

- A detailed description of Ocwen's current policies and practices regarding revocation of TCPA consent, including any documentation describing these policies and practices.

A status hearing, to be conducted by telephone, is set for July 12, 2017 at 8:30 a.m. Counsel are directed to set up a call-in number and are to provide it to chambers by no later than 12:00 p.m. on July 11, 2017.

_____
      MATTHEW F. KENNELLY
      United States District Judge

Date: June 28, 2017