IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **Snyder**, *et al.* <br><br> v. <br><br> **Ocwen Loan Servicing, LLC** | Case No. 1:14-cv-8461 <br> (related to *Snyder v. U.S. Bank, N.A., et al.*, No. 16-cv-11675) <br><br> Hon. Matthew F. Kennelly |

## Opposition to Defendant's Motion for Hearing
## re Breach of Agreed Protective Order

Ocwen's motion (dkt. 268) fails because it directly conflicts with the express terms of the Agreed Protective Order (dkt. 44). Paragraph 6 of that order reads, in pertinent part:

> No party shall be found to have violated this Order for failing to maintain the confidentiality of material during a time when that material has not been designated Confidential Information, even where the failure to so designate was inadvertent and where the material is subsequently designated Confidential Information.

Ocwen admits that it did not designate the Aspect Dialer Data as confidential until August 2017, some twenty months after it was produced. As such, it cannot complain that the Data was used in a way that violates the Agreed Protective Order.

Ocwen's motion also fails by its own facts. Ocwen admits that it knew it was facing dozens of lawsuits from potential class members in December 2016 and had the names, phone numbers, and alleged call counts for each — well before it entered into negotiations to settle this action on a class-wide basis. It conducted thorough investigations into those claims, as the emails from its outside counsel attest. See, e.g., Email of Dec. 2, 2016 at 11:50 am from Virginia Bell Flynn ("Also, I just want to confirm that the numbers you have provided for each of the Plaintiffs are the only

1

numbers at issue. *This will help us properly prepare for mediation.*") (Dkt. 268-1, at 4 [PageID #5619]) (emphasis added). This mediation occurred in January 2017, months before the parties' third mediation in late July, and concerned about fifty individual claims. Ankcorn Decl., ¶¶ 22-23. When those talks broke down, those individuals filed suit. *Id.*, ¶ 23. Ocwen now pretends to be shocked that there are lawsuits other than this class action and hints (without actually claiming) that it wants grounds to renegotiate the settlement reached here.

Finally, its accusations about violations of the Gramm-Leach-Bliley Act are misplaced because the law itself exempts any information that is otherwise publicly available. As detailed below, the Aspect Data had no names or addresses, only telephone numbers, and to send out investigation letters, Mr. Ankcorn retained a firm to perform "reverse look-ups" based on public databases. A phone number that was private or excluded from those databases was not used since no contact information could be found. Consequently, all of the telephone numbers were public information and hence exempt from the GLBA.

At bottom, this motion reflects in-fighting between the various law firms (Locke Lord, Troutman Sanders, Hunton & Williams, and others) hired by Ocwen to defend the many TCPA suits it is facing across the country. It has nothing to do with Mark Ankcorn or the Ankcorn Law Firm and should be denied outright.

1. **Class Counsel did not Solicit Putative Class Members and Accessed Only Summaries of the Aspect Data**

Counsel for Plaintiff Snyder originally sought class and call data in order to investigate the claims and establish a basis for class certification. Ocwen refused and

counsel moved to compel that information in October 2015. Dkt. 49. After the motion presentment hearing and further negotiation between counsel, Ocwen turned over the data from its Aspect automatic dialing system ("Aspect Data") in early December 2015. Ankcorn Decl., ¶ 2. Based on that partial production and representations for further production, Plaintiff Snyder withdrew his motion. Dkt. 57.

The Aspect Data was not well organized. Many of the fields were blank for certain phone calls. A small, redacted, sample of the data is attached as Exhibit "A" to the Declaration of Mark Ankcorn. In total, there were 356,720,589 rows to the call data. Ankcorn Decl., ¶ 4. Significant work by both Plaintiff's retained expert (Jeff Hansen) and counsel was required to put the Aspect Data into any useable shape. *Id.*, ¶¶ 5-6. After comparing the list of phone numbers dialed by the Aspect system with the dates of each call to a list of known cell phone numbers, Mr. Hansen determined that 146,399,026 of those calls were to 1.45 million unique cell phone numbers. *Id.*, ¶ 5.

In June 2016, Class Counsel Mark Ankcorn, undertook a more thorough analysis of the data and created a new database out of the Aspect Data that included only three fields: the date and time of each call and the target telephone number. *Id.*, ¶ 6. This work was done using standard Unix utility software following commonly-accepted practices in the software and data analysis industry and took several weeks to complete. *Id.* The end result was a MySQL database of approximately 16.4 gigabytes. *Id.* A redacted sample of that database is attached as Exhibit "B" to the Declaration of Mark Ankcorn.

Ankcorn then ran a frequency analysis to identify telephone numbers that had been called by Ocwen more than 500 times during the data period and the result of this analysis showed 181,560 such numbers — about 12.5% of the total unique cellular

3

telephone numbers. *Id.*, ¶¶ 8-9. This analysis also showed that 41,295 telephone numbers had been called one thousand times or more and 2,948 telephone numbers were calls two thousand times or more. *Id.*, ¶ 10.

In August 2016, Class Counsel made the strategic decision to investigate whether or not there would be evidentiary support for a preliminary injunction motion, based on anecdotal evidence relayed by Ankcorn. *Id.*, ¶¶ 11-12. Ankcorn took a sample list of telephone numbers and retained a vendor to perform "reverse lookups" on those numbers, using publicly available information to find the name and address of the subscribers. *Id.*, ¶ 13. Ankcorn then sent approximately 2,000 letters to those individuals asking them to call or email if they had information to share. *Id.*, ¶ 14.

This letter was not in any way a solicitation and Ankcorn took great pains to ensure that it was steered clear of any solicitation rules in jurisdictions to which the letter would be sent. *Id.*, ¶ 15. In fact, the letter included an express disclaimer that the purpose of the communication was not to solicit for professional employment. *Id.*, ¶ 16. Ankcorn also hired a call center to answer and screen the calls based on certain criteria, to prioritize additional follow-up. *Id.*

Ankcorn personally handled inquiries by phone and email from more than seventy potential witnesses and spent significant time speaking with them, reviewing documents, and following up. *Id.*, ¶ 17. This investigation served as the basis for Plaintiffs' motion for preliminary injunction on a classwide basis, filed in October 2016. Dkt. 97. This motion was supported by the declarations of Jon Cody and Steve Bartolone, two Ocwen borrowers who were harassed and abused by Ocwen when they fell behind on their payments. Dkt. 97-5 (Bartolone); dkt. 97-6 (Cody). Ocwen in turn took the depositions of those witnesses and produced additional documents relating to

4

their individual borrower files and communications, and then used that discovery to oppose the motion. Dkt. 128.

During the course of this investigation, dozens of potential witnesses expressed significant frustration with Ocwen's aggressive account servicing and debt collection methods, including the volume and nature of the phone calls they received. *Id.*, ¶ 19. Many expressed an interest in filing suit on those individual claims and asked Ankcorn to recommend attorneys in their area who might take their cases. *Id.*, ¶ 20. Ankcorn was able to connect some, though sadly not all, of these individuals to other lawyers with experience in TCPA cases for additional follow-up. *Id.*, ¶ 21. Ankcorn neither solicited nor accepted a referral fee for any of these cases and has no financial interest in any litigation against Ocwen other than the present class action. *Id.*, ¶ 22.

**2. Class Counsel did not Negotiate in Bad Faith**

Ocwen's claims of bad faith ring hollow. When it sat down on July 20, 2017 to negotiate a settlement (for the third time), it had already been sued by dozens of borrowers in separate suits across the country. Most, if not all, of these consumers had been identified to Ocwen months earlier and Ocwen had investigated those claims and conducted a full day of information mediation at the offices of its litigation counsel, Troutman Sanders, in San Diego, California. Upon information and belief, this mediation session occurred in early January 2017. Ankcorn Decl., ¶¶ 23-24.

Ocwen had also been sued individually earlier in 2017 by two persons who had offered testimony in support of the motion for preliminary injunction here (Jon Cody and Steve Bartolone) and an additional five consumers in a single action in federal

5

court in Florida, its home district and division. *Graham et al v. Ocwen Loan Servicing*, No. 9:17-cv-80639 (S.D. Fla., West Palm Beach Division) (filed May 19, 2017).

Moreover, Ocwen knew it was likely to be sued individually by many more class members because it agreed to a provision in the settlement agreement that would give it the right to nullify the deal if *four thousand* or more class members opted out. Settlement Agreement ("S.A."), § 11.4 (dkt. 252-1). Now that a few dozen have actually followed through and brought suit, Ocwen pretends to be shocked by these developments and claims buyer's remorse.

Had it been concerned about any of these individual lawsuits, Ocwen could have made those actions part of the settlement discussions. In fact, it did just that for the separate litigation which had been brought against the trust pools who own the debt obligations of the class representatives. See S.A., § 3.5 (requiring dismissal of related actions including *Snyder, et al. v. U.S. Bank, N.A., et al.*, No. 1:16- cv-11675 MFK (N.D. Ill.). Notably, the Ankcorn Law Firm does not represent Mr. or Mrs. Bartolone in their individual action against Ocwen and has never entered an appearance in that matter, even though such representation would have been entirely appropriate. Well before Class Counsel had any hint that Ocwen was considering settling the present class action, Ankcorn had already taken steps to refer out any Ocwen-related matter due to a serious health issue in his family which required his personal attention and significant time commitment. Ankcorn Decl., ¶ 25.

With respect to the *Graham* litigation, responsive pleading has not yet been filed on Ocwen's behalf and the Ankcorn Law Firm did not prepare the First Amended Complaint which added additional plaintiffs. The firm is in the process of withdrawing from that matter. *Id.*, ¶ 26.

### 3. Class Counsel Breached No Ethical Rules in Representing or Investigating Individual Claims

Simultaneous representation of multiple plaintiffs against a single defendant is neither misconduct nor an ethical violation. Representing multiple, unrelated clients against a common defendant raises ethical concerns only where cost of complying with a judgment in favor of one client will render the defendant financially unable to satisfy the claims of another client. See, e.g., *D.C. Bar Ethics Opinion* 301 (July 2000) (interpreting Rule 1.7 to permit simultaneous representation of a certified class and individual class members); *Smith v. Ga. Energy USA, LLC*, 2014 U.S. Dist. LEXIS 133899, *3 (S.D.Ga., Sept. 23, 2014) (representation of class and individual plaintiffs not permitted "in light of the advanced stage of this litigation and the substantially depleted pool of funds from which both of Class Counsel's clients now seek relief.").

These conflicting interests must be more than speculative and can be waived by the clients in the event it ripens into an actual conflict. *In re Sea Star Line, LLC*, 2017 WL 485700, *53-54 (M.D. Fla., Feb. 6, 2017) (estates of three passengers killed during Staten Island Ferry crash could be represented by the same law firm, at least until damages phase of litigation). Ocwen nowhere presents evidence that it is financially unable to satisfy the claims of these consumers, it just says it would rather not do so. But financial inconvenience isn't sufficient reason to disqualify counsel or nullify a settlement.

As noted above, though, even this line of cases permitting simultaneous representation is not truly relevant given that the Ankcorn Law Firm is in the process of withdrawing from representation in the *Graham* action, the sole lawsuit alleging

claims against Ocwen where the firm has entered an appearance. Ankcorn Decl., ¶ 26. Ocwen simply cannot demonstrate any prejudice that resulted from this slight overlap in representation.

**4. Ocwen has Improperly Designated Data that is Not Confidential**

In order for materials to eligible for confidentiality under a protective order, a court must make a determination that there is "good cause" to keep those materials confidential. *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 944-45 (7th Cir. 1999). Here, Ocwen seeks to protect a list of 350 million calls showing the date and time each call was made and the target telephone number for each call.

Ocwen argues that this information is "plainly confidential" because "it contains borrower telephone numbers that are protected against disclosure by statute [the Gramm Leach Bliley Act]." Motion, at 8 fn. 5 (dkt. 268). But this is not so. Ocwen relies on the definition of non-public information found in the GLBA and argues that any information supplied to it by a borrower is therefore confidential. Ocwen misreads the GLBA and conflates that erroneous definition with the good cause standard required under Seventh Circuit precedent.

First, the GLBA's definition of non-public information excludes data that is otherwise available from pubic sources. The example of this exception cited by the FTC in its published guidance[1] is a telephone number that is publicly listed in a phone book. The gravamen, however, is the connection between the person's name and phone number. Nowhere does the FTC state that a list of phone numbers standing alone

---

[1] See https://www.ftc.gov/tips-advice/business-center/guidance/how-comply-privacy-consumer-financial-information-rule-gramm (last accessed November 23, 2017).

8

would be in any way protected information. Once stripped of its context, a list of dates, times, and phone numbers says nothing about a person or his or her relationship with a financial entity. It is not, and should not be, considered "confidential" in any way. The FTC also notes that the fact of a borrower-lender relationship isn't itself confidential because many state's recording laws require that information to be publicly listed in government records. So the fact that a specific person's mortgage is or was serviced by Ocwen is similarly not considered non-public information under the GLBA.

Furthermore, Ocwen admitted in discovery that it regularly skip traced its customers to find additional ways to contact them, using databases that include credit reports and other information sources. And when it acquires new loans to service, Ocwen takes no steps to verify the information it receives from the prior servicer or lender nor does it check the loan file to see if the loan was already foreclosed on or discharged in bankruptcy. Thus, even by its own too-restrictive definition of non-public information as "anything supplied by the borrower," many if not most of the phone numbers it called weren't in fact obtained from the borrower. Caller ID capture and other methods of gleaning contact information would similarly not be protected under the GLBA. And as noted above, the actual contact information for the investigation came from reverse look-ups commissioned by Ankcorn — not the Aspect Data, which had no personal information in it. These reverse look-ups were done from public databases and as such only returned useful contact information for people with public phone numbers, excluding those phone numbers from coverage under the GLBA.

Second, the definition of good cause is a far higher hurdle to clear than the GLBA's definition of non-public information. All Ocwen claims is that it is inconvenienced by having to defend a variety of TCPA suits from consumers it called

9

hundreds and often thousands of times. Ocwen nowhere states that disclosure of the data would somehow make it less competitive in the marketplace against other mortgage servicers, like, for example, disclosure of a patent or trade secret or software source code.

This Court has previously rejected similar claims that a party is prejudiced by having to defend multiple lawsuits stemming from its own conduct based on its own records that have no competitive risk to the business by disclosure. In *C.E. Design, Ltd. v. Cy's Crabhouse North, Inc.*, this Court found that a customer list wasn't properly designated as confidential because the proffered reason for secrecy (annoyance and expense of litigation) didn't justify keeping those records protected from disclosure. 2010 WL 3327876 at *8-10 (Aug. 23, 2010). That customer list presumably contained far more personal data than simply a date, time, and telephone number that is at issue here. Ocwen has not suggested any other reason for keeping the Aspect Data confidential, except that it would rather not defend itself from dozens of individual, high-value TCPA suits.

Finally, Ocwen is legally obligated under federal law to turn over all information in its possession that relates to a borrower upon request. Title 12 of the United States Code, Section 5533(a) provides that financial institutions including mortgage servicers "shall make available to a consumer, upon request, information in the control or possession of the covered person concerning the consumer financial product or service that the consumer obtained from such covered person, including information relating to any transaction, series of transactions, or to the account including costs, charges and usage data. The information shall be made available in an electronic form usable by consumers." Ocwen can't hide behind the Gramm-Leach-Bliley Act and insist on

confidentiality while refusing to comply with a more recent federal statute that requires disclosure.

## Conclusion

This Court should reject Ocwen's attempts to fling mud at opposing counsel based on false supposition and conjecture, while ignoring its own failure to designate and knowledge of other litigation. The motion for a hearing and related discovery should be denied.

Respectfully submitted,

Dated: November 29, 2017

ANKCORN LAW FIRM PLLC

*/s/ Mark Ankcorn*
N.D. Illinois General Bar No. 1159690
California Bar No. 166871
Florida Bar No. 55334
mark@ankcornlaw.com

1060 Woodcock Road, Suite 128
Orlando, Florida 32803
(321) 422-2333 phone
(619) 684-3541 fax

Attorneys for Plaintiffs and Class

11

**Certificate of Service**

      I hereby certify that on November 29, 2017, I electronically filed the above and foregoing notice and motion through the Court's CM/ECF System, which perfected service on all counsel of record.

*/s/ Mark Ankcorn*