UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Keith Snyder and Susan Mansanarez, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> Ocwen Loan Servicing, LLC, <br><br> Defendant. | Case No. 1:14-cv-08461 <br><br> Honorable Matthew F. Kennelly <br><br> Consolidated |
| Tracee A. Beecroft, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> Ocwen Loan Servicing, LLC, <br><br> Defendant. | Case No. 16-cv-08677 <br><br> Honorable Matthew F. Kennelly <br><br> Consolidated |

**OCWEN'S REPLY MEMORANDUM ON ITS MOTION FOR THE COURT TO HOLD A HEARING TO DETERMINE WHETHER PLAINTIFFS' COUNSEL HAS BREACHED HIS DUTY OF CONFIDENTIALITY, AND FOR LEAVE TO TAKE DISCOVERY INTO THE EXTENT OF PLAINTIFFS' COUNSEL'S BREACHES**

**Table of Contents**

I. Mr. Ankcorn's contention that Ocwen's call data was not confidential is incorrect..............................................................................................1

II. Mr. Ankcorn's contention that he used Ocwen's data only in the present case is not convincing.................................................................................5

III. Mr. Ankcorn's contention that he gave Ocwen's data to Hyde and Swigart for free underscores the need for discovery. .........................................7

Conclusion .................................................................................................................8

**I.      Mr. Ankcorn's contention that Ocwen's call data was not confidential is incorrect.**

Mr. Ankcorn insists that he did nothing wrong because Ocwen's call data wasn't properly designated as confidential under the protective order, and that anyway there wasn't "good cause" to keep that data confidential. (Opp. Mem. (Dkt. 272) at 1, 8-10.) But the data was produced with an understanding between counsel that it was confidential and should be treated as such: it was produced under lock and key on an encrypted, password-protected hard drive, following discussions between counsel about appropriate security protocols. (Fleischmann Decl. (Dkt. 269) ¶¶ 7-8.) Further, Mr. Ankcorn himself acknowledged that the data would be subject to the confidentiality agreement when he stated in his October 6, 2015 motion to compel that the production of class call data would be "only minimally invasive, particularly where (as here) the parties and counsel are subject to a protective order." (Dkt. 49 ¶ 25.) Mr. Ankcorn contends that Ocwen has no recourse under the protective order because the production was not expressly designated as confidential. (Opp. Mem. at 1.) But this misses the point: Mr. Ankcorn and his co-counsel knew that the data was confidential, and they had given good reason to believe they would treat it as confidential. But Mr. Ankcorn -- alone among Plaintiffs' counsel, it appears -- nevertheless refused to treat it as such. His argument that there's no foul play because the terms of the protective order weren't breached rests on the false premise that the protective order was the only source of his duty of confidentiality.

And Mr. Ankcorn's revised declaration doesn't address how it happened that the data was used in the amended Graham pleading after that data was expressly designated as confidential in August. That amendment, filed in October, added 42 new plaintiffs based on allegations taken from Ocwen's data. Mr. Ankcorn doesn't deny that he was the source of this data. He states that "[s]ince approximately June 2017, my firm has had no involvement" in Graham. (Ankcorn Revised Decl. (Dkt. 276) ¶ 26.) So, it seems, he gave Ocwen's data to Hyde and Swigart, his co-

counsel in Graham,[1] to be used in amending the pleading to add the new plaintiffs, but he doesn't say when he provided the call data to them despite the Court's instruction that his revised declaration include relevant dates.[2]

In fact, what he does say obfuscates the issue. Mr. Ankcorn tells the Court that he handed Hyde and Swigart leads with respect to "dozens" of potential claimants in the Fall of 2016, and that Hyde and Swigart sought to resolve these cases with Ocwen before filing suit. (Id. ¶¶ 17-23.) Hyde and Swigart sent Ocwen demand letters with respect to 78 claimants, but the 42 new Graham plaintiffs were not among them.[3] So, it seems, these additional Graham plaintiffs were identified, contacted, and persuaded to bring suit, in a second outreach exercise not described in Mr. Ankcorn's declaration -- and, in light of the October 2017 amendment to add these plaintiffs, an exercise that can't be explained away as the byproduct of Mr. Ankcorn's attempt to find declarants to support Plaintiffs' 2016 preliminary injunction motion.[4]

Mr. Ankcorn's declaration therefore contains significant gaps: What data did he give to Hyde and Swigart? When did he give it to them? And how, when, and by whom, were the 42

---

[1] Hyde and Swigart and the Kazerouni firm share a number of members: both Robert L. Hyde and Joshua B. Swigart are of counsel at the Kazerouni Law Group and Abbas Kazerounian is of counsel at Hyde and Swigart. See http://www.westcoastlitigation.com/ and https://www.kazlg.com/ (each last visited December 14, 2017). Reference herein to Hyde and Swigart will thus also be to the Kazerouni firm.

[2] The Court also instructed that Mr. Ankcorn "include something in the affidavit regarding . . . what, if anything, you have done with any of this data subsequent to getting Mr. Fleischmann's August 10th letter." (Tr. of Nov. 30, 2017 Hearing at 25:19-23.) Mr. Ankcorn describes the occasions he "accessed" the data, but says nothing about whether he sent the data to others for their use or whether he allowed others to access the data.

[3] Compare the proposed tolling agreements attached hereto as Exhibits 1 & 2 listing these claimants, with the plaintiffs in the First Amended Complaint filed in Graham (Exh. K to Fleischmann Decl. (Dkt. 269-11)).

[4] It was not until the late summer of 2017 that Ocwen began to suspect that its data was being used to identify new individual plaintiffs. Those suspicions -- and the identity of the source of the data -- were confirmed by the October 20, 2017 addition of 42 plaintiffs to Graham, at which point Ocwen acted promptly to make this motion.

- 2 -

new Graham plaintiffs identified? Only with answers to these questions is it possible to determine the full scope of Mr. Ankcorn's use of Ocwen data, the plausibility of his explanation of why he used Ocwen's data to identify potential claimants, and, consequently, the scope of his breaches of his confidentiality obligations. The Court should allow discovery to get these answers.

And Mr. Ankcorn's argument that the data isn't protected by statute because it is publicly available (Opp. Mem. at 8-9) is simply incorrect. Mr. Ankcorn claims he was not barred by the GLBA from using Ocwen's data to identify new clients because the phone numbers he derived from the call data were "otherwise available" from public sources. That is wrong. As the court in Individual Reference Servs. Grp., Inc. v. F.T.C. held, the GLBA protects "all information . . . derived using nonpublic personal information. This is so even where the information is otherwise publicly available." 145 F. Supp. 2d 6, 27 (D.D.C. 2001) (emphasis added), aff'd sub nom. Trans Union LLC v. F.T.C., 295 F.3d 42 (D.C. Cir. 2002).

In claiming that Ocwen's data is public, Mr. Ankcorn ignores the statutory definition of "publicly available information" -- information that the financial institution providing it (i.e., Ocwen) has a "reasonable basis" to believe can lawfully be made public. 16 C.F.R. § 313.3(p)(1). Ocwen would have such a "reasonable basis" only if it had "taken steps" to determine (i) that the information is available to the general public and (ii) that the consumer has not directed that that information be withheld from the public. Id. § 313.3(p)(2). There is no suggestion that Ocwen has "taken steps" to determine which phone numbers in its records are publicly listed and which are not, and so that call data cannot be "publicly available information" under the GLBA. Ameriquest Mortg. Co. v. Washington State Office of Atty. Gen., 170 Wash. 2d 418, 434 (Wash. 2010) (phone numbers in Ameriquest's records were nonpublic information

because "[o]nly Ameriquest can form the reasonable basis to color the information that way, and nothing suggests that Ameriquest has taken the necessary steps").

Mr. Ankcorn is equally incorrect in his claim that Ocwen's use of skip-tracing means its call data isn't protected. At most, the use of skip-tracing means Ocwen knew that <u>some</u> of the phone numbers in the call data were publicly available. But FTC regulations define "nonpublic personal information" as "[a]ny list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using <u>any</u> personally identifiable financial information that is not publicly available." 16 C.F.R. § 313.3(n)(1) (emphasis added). Mr. Ankcorn acknowledges that most of the phone numbers in the call data were provided by customers, not public sources, and so any list derived from that call data would also be protected by the GLBA.

The FTC website that Mr. Ankcorn cites makes that very point: information is subject to the GLBA's restrictions as long as it is not derived <u>entirely</u> from publicly available information. The FTC there gives an example of a list derived entirely from publicly available information -- "a list of a lender's mortgage customers in a jurisdiction that requires that information to be publicly recorded."[5] But it immediately distinguishes that example from cases in which a list is derived using some nonpublic personal information ("NPI"):

> <u>But a list derived even partially from NPI is still considered NPI.</u> For example, a creditor's list of its borrowers' names and phone numbers is NPI even if the creditor has a reasonable basis to believe that those phone numbers are publicly available, because the existence of the customer relationships between the borrowers and the creditor is NPI. (emphasis added)

---

[5] <u>See</u> https://www.ftc.gov/tips-advice/business-center/guidance/how-comply-privacy-consumer-financial-information-rule-gramm (last visited Dec. 15, 2017). Mr. Ankcorn suggests that such statutes require Ocwen to make public the identity of the borrowers whose loans its services. He is wrong: such statutes apply to lenders, not to servicers.

Ocwen has no reasonable basis to believe either that the phone numbers in its records or the names of its customers are publicly available. Such information is, therefore, protected under the GLBA, as is any information derived from it -- including the lists of phone numbers Mr. Ankcorn used to identify new clients.

**II.     Mr. Ankcorn's contention that he used Ocwen's data only in the present case is not convincing.**

Mr. Ankcorn admits that he used Ocwen's call data to identify and contact class members with potential high-value claims; that he referred many of those he contacted to the Hyde and Swigart law firm; and that Hyde and Swigart then commenced actions on behalf of many of those persons on the basis of the Ocwen call data Mr. Ankcorn supplied. (Ankcorn Revised Decl. ¶¶ 8-11, 21-24.) And he doesn't deny that he himself commenced the Florida Graham case on behalf of five such persons he identified through Ocwen's call data,[6] and that the Hyde and Swigart firm added 42 more claimants identified by him using Ocwen's data.[7]

However, Mr. Ankcorn argues that he nevertheless only used Ocwen's data for the present case to identify potential declarants to support Plaintiffs' 2016 motion for a preliminary injunction, and that any further use was simply a by-product of that primary use. (Opp. Mem. at 4.) But this argument is unconvincing, not least because of the eventual use made of his

---

[6] Mr. Ankcorn told the Court that he "technically made an appearance" in Graham. (Tr. of 11/30/17 Hr'g at 24:18-19.) But he was the only counsel identified in the initial Graham summons and complaint, and signing a complaint, with all the Rule 11 consequences, is hardly a "technical appearance."

[7] Mr. Ankcorn mentions the recent filing in Graham of a scheduling report containing his supposedly unauthorized electronic signature. (Revised Decl. ¶ 27.) What this has to do with the present motion is obscure. However, the report was negotiated by the Graham parties over a period of two weeks, during which time Mr. Ankcorn was copied on the drafts exchanged by the parties, which included his name and electronic signature in the parties' signature blocks. Neither he nor his co-counsel objected to the inclusion of his name and e-signature in the signature blocks during these two weeks of negotiations, and Mr. Ankcorn admits he didn't read the drafts, and withdrew as counsel in Graham only after the report was filed. (Id.)

outreach exercise in the preliminary injunction motion itself. That motion (Dkt. 97) included the testimony of two persons in addition to the named plaintiffs: Messrs. Cody and Bartolone. Cody and Bartolone were deposed, and it turned out that their declarations contained material false statements, and Plaintiffs made hardly any attempt to rehabilitate their testimony in their reply memorandum.[8] So, despite the significant effort and expense supposedly devoted to finding persons who could assist Plaintiffs' preliminary injunction motion, Mr. Ankcorn's exercise identified only two flawed declarants, even though it identified scores of other persons with potential claims against Ocwen. This strongly suggests that finding declarants to use in this case was not the entire goal of the outreach exercise -- but instead the exercise was also undertaken to identify potential high-value claimants who would bring their own claims (including Cody and Bartolone, both of whom subsequently filed their own claims).

Additionally, Mr. Ankcorn's descriptions of the conversations he had with the persons who responded to his outreach efforts are unconvincing. "Many" of these persons "expressed an interest in filing suit on their individual claims and asked me to recommend attorneys in their area who might take their cases." (Revised Decl. ¶ 20.) Mr. Ankcorn insists that his outreach exercise was "**not**" to solicit persons to bring their own claims (id. ¶ 16, Mr. Ankcorn's emphasis), but it is hard to believe that all these persons, unprompted by Mr. Ankcorn, spontaneously expressed an interest in bringing their own claims and asked Mr. Ankcorn (someone they had never before met) for his advice about attorneys who might bring the claims -- particularly in the course of a conversation with the very attorney who was pursuing relief for them as members of the class in this case.

---

[8]  Ocwen Opp. Mem. (Dkt. 129) at 4-6; Plaintiffs' Reply Mem. (Dkt. 136).

**III.  Mr. Ankcorn's contention that he gave Ocwen's data to Hyde and Swigart for free underscores the need for discovery.**

Mr. Ankcorn insists that he "neither solicited nor accepted a referral fee for any of these cases and [has] no financial interest in any litigation against Ocwen other than the present class action." (Id. ¶ 22.)  If Mr. Ankcorn is here intending to deny that he has received anything of value from the Hyde and Swigart firm for handing them high-value TCPA claimants on a plate, then his denial is very hard to credit.  He went to the trouble and expense of retaining a vendor to identify these claimants and send them letters and hiring a call center to field and screen the calls, and he himself spent "significant time speaking with them, reviewing documents, and following up." (Id. ¶¶13-17.)  And then, despite all this work and expense, he handed scores of potentially lucrative cases -- already reviewed and screened by him -- to Hyde and Swigart <u>for nothing</u>?

And what of the <u>Graham</u> case?  Mr. Ankcorn was sole counsel for the original five plaintiffs and no doubt had retainer agreements with these five which entitled him to some share of any recoveries.  But he now insists that he has no financial interest in <u>Graham</u>.  So, it would seem to follow, he gave away his financial interest in his <u>Graham</u> case.  But to who?  And why?  And when?  Mr. Ankcorn's statement that he "neither solicited nor accepted a referral fee for any of these cases and [has] no financial interest in any litigation against Ocwen other than the present class action" thus by itself shows why Ocwen should be allowed discovery.

## Conclusion

Mr. Ankcorn's opposition and his declarations show the need for discovery into the scope of his breaches of his duty to keep Ocwen's data confidential so that the Court can determine appropriate sanctions for his breaches.

Respectfully submitted,

*/s/ Simon Fleischmann*
Simon Fleischmann (6274929)
*sfleischmann@lockelord.com*
Thomas J. Cunningham (6215928)
*tcunningham@lockelord.com*
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
Phone: 312-443-0700

Brian V. Otero, Admitted Pro Hac Vice
*botero@hunton.com*
Stephen R. Blacklocks, Admitted Pro Hac Vice
*sblacklocks@hunton.com*
Ryan A. Becker, Admitted Pro Hac Vice
*rbecker@hunton.com*
HUNTON & WILLIAMS LLP
200 Park Avenue
New York, NY 10166
Telephone: 212-309-1000

Attorneys for Defendant
Ocwen Loan Servicing, LLC

**CERTIFICATE OF SERVICE**

      I, Simon Fleischmann, an attorney, certify that I caused the foregoing to be served upon all persons and entities authorized and registered to receive such service through the Court's Case Management/Electronic Case Files (CM/ECF) system on December 15, 2017.

                                                */s/ Simon Fleischmann*