```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   KEITH SNYDER, individually and on   )  Docket No. 14 C 8461
     behalf of all others similarly      )           11 C 11675
 4   situated, et al.,                    )
                                          )
 5                        Plaintiffs,     )
                                          )
 6                vs.                     )  Chicago, Illinois
                                          )  January 4, 2018
 7   OCWEN LOAN SERVICING LLC,            )  10:10 o'clock a.m.
                                          )
 8                        Defendant.      )

 9              TRANSCRIPT OF PROCEEDINGS - MOTION
          BEFORE THE HONORABLE MATTHEW F. KENNELLY
10

11   APPEARANCES:

12
     For the Plaintiffs:    ANKCORN LAW FIRM, PLLC
13                          BY:  MR. MARK DANIEL ANKCORN
                            1060 Woodcock Road, Suite 128
14                          Orlando, FL  32803
                            (321) 422-2333
15

16                          BURKE LAW OFFICES, LLC
                            BY:  MR. ALEXANDER HOLMES BURKE
17                               MR. DANIEL J. MAROVITCH
                            155 North Michigan Avenue, Suite 9020
18                          Chicago, IL  60601
                            (312) 729-5288
19

20                          TERRELL MARSHALL LAW GROUP PLLC
                            BY:  MS. BETH ELLEN TERRELL
21                          936 North 34th Street, Suite 300
                            Seattle, WA  98103
22                          (206) 816-6603

23
     Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                          Official Court Reporter
                            219 S. Dearborn Street, Suite 2102
25                          Chicago, Illinois  60604
                            (312) 435-5639
```

1   APPEARANCES CONTINUED:

2

3                           THE CABRERA FIRM, APC
                            BY:   MR. GUILLERMO CABRERA
                            600 West Broadway, Suite 700
4                           San Diego, CA  92101
                            (619) 500-4880
5

6

7   For the Defendants:     LOCKE LORD LLP
                            BY:   MR. SIMON A. FLEISCHMANN
                            111 South Wacker Drive
8                           Chicago, IL  60606
                            (312) 443-0462
9

10                          HUNTON & WILLIAMS LLP
                            BY:   MR. RYAN ANDREW BECKER
11                                MR. BRIAN VINCENT OTERO
                            200 Park Avenue
12                          New York, NY  10166
                            (212) 309-1000
13

14

15

16

17

18

19

20

21

22

23

24

25

1    (The following proceedings were had in open court:)

2         THE CLERK:  Case No. 14 C 8461, Snyder v. Ocwen Loan.

3         THE COURT:  Let's get everybody in a spot.  We will

4    start with whoever is on this side and just go across the

5    room.

6         MR. BECKER:  Good morning, your Honor.  Ryan Becker

7    on behalf of defendant.

8         MR. FLEISCHMANN:  Good morning, your Honor.  Simon

9    Fleischmann also on behalf of the defendant.

10        MR. ANKCORN:  Mark Ankcorn on behalf of the class and

11   plaintiffs.

12        MS. TERRELL:  Beth Terrell on behalf of the

13   plaintiffs and the class.

14        MR. MAROVITCH:  Dan Marovitch on behalf of the

15   plaintiffs and the class.

16        MR. CABRERA:  Good morning, your Honor.  Guill

17   Cabrera on behalf of the plaintiffs and the class.

18        THE COURT:  Okay.  So there was one motion that asked

19   to move some dates that correspond with the -- so this is the

20   motion for extension of time.  Pam, that is docket number --

21   whatever it is.

22        MS. TERRELL:  281?

23        THE COURT:  Yeah, there you go.  So the deadline for

24   exclusions from the class and objections to the settlement is

25   extended to March the 5th, and the due date for the fee

4

1    petition is extended to -- is this right?  January the 5th,

2    that's tomorrow basically.

3            MS. TERRELL:  Yes.

4            THE COURT:  Fine.

5            MS. TERRELL:  Thank you.

6            THE COURT:  We are not moving the hearing date or

7    anything like that.

8            MS. TERRELL:  No, your Honor.

9            THE COURT:  Just to make everything kind of still

10   match up.

11           All right.  So let me just get all of this stuff in

12   front of me here.  Bear with me one second.

13           So glad you're here, Mr. Ankcorn.  I got a couple of

14   questions for you.  So, first of all, somewhere in one or

15   maybe more than one of the affidavits that you filed, you

16   talked about a letter.  Yeah, it's the document 276, the one

17   that you filed back on December the 8th.  Paragraph 14 says

18   that you asked the vendor who was doing the reverse lookups to

19   send approximately 2,000 letters to individuals who -- names

20   popped up on the list asking them to call or email if they had

21   information to share.  To the best of your recollection, those

22   were sent out in late August of 2016.  Then you go on to say

23   that the letter was not a solicitation.  Do you have a copy of

24   it?

25           MR. ANKCORN:  I have -- it's hard to say because when

1　I handed it over to the mail house, they made some formatting

2　corrections.  And in the course of making those formatting

3　corrections, they changed the format of the letter.  I don't

4　have a copy --

5　　　　　　THE COURT:  They changed the text of the letter?

6　　　　　　MR. ANKCORN:  They did.  They took out -- one of the

7　merged fields didn't work right or something like that, and so

8　they changed the letter.  I can get you a copy of what I sent

9　them.  It may not be exact.

10　　　　　　THE COURT:  Can I get a copy of what they sent out?

11　　　　　　MR. ANKCORN:  The only way I saw that it was

12　different was when a few of them bounced back because the

13　addresses were wrong.  And so when I --

14　　　　　　THE COURT:  Did you keep copies of what bounced back?

15　　　　　　MR. ANKCORN:  I did for a while.  I'm not sure I have

16　them currently.

17　　　　　　THE COURT:  Okay.  So this is a vendor you hired,

18　right?

19　　　　　　MR. ANKCORN:  Correct.

20　　　　　　THE COURT:  So if you picked up the phone and said,

21　the judge told me to get a copy of the letter that you sent

22　out at my direction, do you think they would say anything

23　other than where do I send it to?

24　　　　　　MR. ANKCORN:  I think they would make a very diligent

25　search for that letter, and if they had it, they would

1   absolutely turn it over to you.

2          THE COURT:  The reason you're getting a stupefied

3   look on my face is that my reaction to that is I am stupefied

4   by that answer being anything other than "absolutely, Judge."

5   That this letter that you've made representations to me about

6   what it was and what it was not might not actually be

7   available.

8          MR. ANKCORN:  Well, Judge --

9          THE COURT:  I tell you what, let's do this.  Where is

10  this vendor?

11         MR. ANKCORN:  Orange County, California.

12         THE COURT:  Okay.  It's 8:15.  Do you think they're

13  in?

14         MR. ANKCORN:  I think.

15         THE COURT:  Go make a call.

16         MR. ANKCORN:  Happy to.

17         THE COURT:  Go make a call.  Find out if they can

18  email the letter to me right now.  Here is my email address.

19  I am handing to -- Pam will hand you a copy of my business

20  card.  I will recall the case once you walk back in the room.

21  Walk back in the room once you have talked to them.  Have a

22  seat.

23    (Short break.)

24         THE CLERK:  Case No. 14 C 8461, Snyder v. Ocwen Loan.

25         THE COURT:  Stand in the same places.  That way you

1    don't have to give your names again.

2        So, Mr. Ankcorn, did they send me something?

3        MR. ANKCORN:  I spoke with her on the phone.  She was

4    out of the office.  It was 8:15 on the west coast.  She said

5    she would be in the office in approximately 90 minutes.  From

6    that conversation, because she had a doctor's appointment --

7        THE COURT:  So what did the letter say, as best you

8    recall it?

9        MR. ANKCORN:  So I was able to find a non-final draft

10   of what I sent to them.  She confirmed to me that they did not

11   change the substance of the letter.  It was just formatting

12   changes.

13       THE COURT:  Yeah.

14       MR. ANKCORN:  Before it went out, I removed -- I can

15   show you the draft.

16       THE COURT:  Okay.

17       MR. ANKCORN:  I removed a merge field that had the

18   total number of calls.

19       THE COURT:  Okay.

20       MR. ANKCORN:  So that was out before it went out.

21       THE COURT:  Okay.

22       MR. ANKCORN:  I have a Word copy of that.  I can

23   circulate that to your Honor and to counsel.

24       THE COURT:  I want to look at it.  That's why I had

25   you guys sitting around here waiting.  I want to look at it.

1   I want to be done with this today.  Okay?  So you have

2   something on you that I can look at?

3               MR. ANKCORN:  Yes.

4               THE COURT:  Was it on your phone or something like

5   that?

6               MR. ANKCORN:  Yes.

7               THE COURT:  Okay.  Well, hand me your phone.

8               MR. ANKCORN:  I have the copy on my laptop.  That's

9   bigger.

10              THE COURT:  That's even better.

11              MR. ANKCORN:  I thought you wanted me to email it.

12              THE COURT:  Well, I mean, you could have done that, I

13  suppose.  So go ahead and email it.  Go ahead and email it.

14  That's fine.  Or give me that.  One or the other.

15              MR. ANKCORN:  Sorry.

16              THE COURT:  I'll give it to you to look at in a

17  second.

18              So the part that was taken out is the thing that

19  says, "In the course of our investigation, we learned that

20  your cell phone number received at least blank calls from

21  Ocwen within the last year"?

22              MR. ANKCORN:  Right.  That would read at least one

23  call.

24              THE COURT:  At least one call.  It doesn't give a

25  specific number.

1        MR. ANKCORN:  Correct.

2        THE COURT:  Okay.  You guys come look at this.

3        Show it to them.

4        MS. TERRELL:  Your Honor?

5        THE COURT:  I am doing one thing at a time.  Okay.

6        Second question, now that I've got that, there was a

7    reference in something that somebody filed about one of the

8    lawyers at the other law firm saying something like Mark's

9    data or Mark's list or something like that.  Now, you tell me

10   that you never turned over the list to anybody.  Am I correct?

11       MR. ANKCORN:  Can I be very specific about what a

12   list means?

13       THE COURT:  You best be very specific, yes.

14       MR. ANKCORN:  Sure.  So when you say --

15       THE COURT:  I'm talking about the material that you

16   got from Ocwen that is the subject of all of this briefing.

17       MR. ANKCORN:  Right.  Never turned over, never

18   disclosed, didn't leave my computers.

19       THE COURT:  Okay.  All right.  So when this other

20   person was talking about Mark's information or Mark's data or

21   Mark's list, or whatever it is, what are they talking about?

22       MR. ANKCORN:  That's what I described --

23       THE COURT:  I'm asking you to tell me.  Okay?  I

24   won't tell you why I'm asking you to tell me because I just

25   don't have enough time to do that.

1       MR. ANKCORN:  A total number was turned over to Hyde

2   & Swigart.  They would ask me about a specific client.  I

3   would say the data shows certain things.

4       THE COURT:  So the -- stepping back to look at the

5   forest-not-the-tree's view of what I'm getting from you, what

6   you're telling me is that I didn't turn what I'm calling the

7   list over to anybody.  I used the list to send letters to what

8   we'll call high-level call recipients because I wanted to get

9   information to support immediately the motion for preliminary

10  injunction but maybe more generally the case.  Some of those

11  people, when I ended up talking to them, expressed an interest

12  in filing a lawsuit.  I referred those cases out, maybe with

13  some exceptions.  There is one case you said you were in for a

14  while, and then you got out of it.  I referred those cases

15  out.  They went to this -- I'm blanking on the names of the

16  law firm.  There's two law firms.

17      MR. ANKCORN:  Hyde & Swigart.

18      THE COURT:  Hyde & Swigart.  And the other one is?

19      MR. ANKCORN:  Called Kazerouni Law Group.

20      THE COURT:  I referred these people out to Hyde &

21  Swigart.  They may have called me back and said, what does

22  your data show?  And how many calls this person got?  I

23  answered those questions, period, full stop.  Pretty much,

24  right?

25      MR. ANKCORN:  Pretty much, yes.

1      THE COURT:  Okay.  Having seen the letter, is there

2  anything you want to say about the letter on the defense side?

3  It doesn't strike me as a solicitation to file a lawsuit.

4  Does it strike you that way?

5      MR. FLEISCHMANN:  I don't have any immediate comments

6  on the letter.

7      THE COURT:  This is your opportunity to make

8  comments.  So whether it's immediate or not immediate, it's a

9  "speak now or forever hold your peace" situation.

10      MR. BECKER:  No, your Honor, we do not believe it's a

11  solicitation.

12      THE COURT:  Okay.  All right.  I will tell you about

13  the one thing that I am concerned about here.  I don't recall

14  the exact numbers, but the settlement basically has an out

15  where if more than a certain -- it's either number or

16  percentage of people opts out, then Ocwen can pull the plug.

17      MS. TERRELL:  It's 4,000.  It's 4,000, your Honor.

18      THE COURT:  4,000.  Okay.  And, you know, 4,000 is

19  made up of 4,000 ones.  All right?  And so when a person who

20  is counsel for the class is referring class members out for

21  possible lawsuits, it strikes me that there is at least a

22  straight-faced argument that you are at least kicking up dust

23  on the chalk line of your fiduciary duty to the class, because

24  the more of those people there are, the greater the chance

25  there is that the threshold will be met, the plug will get

1    pulled on the settlement, and the other much larger number of

2    class members whom you have been appointed -- who you have

3    been appointed to represent will be, if I can use a common

4    term in Chicago, SOL.  What am I missing?

5              MR. ANKCORN:  I understand that.

6              THE COURT:  Other than the numbers, what am I

7    missing?

8              MR. ANKCORN:  I understand that completely.  I did

9    not have a fiduciary duty until September 14th when we inked

10   the deal.

11             THE COURT:  Wow.

12             MR. ANKCORN:  Nothing happened --

13             THE COURT:  Wow.

14             MR. ANKCORN:  Well, of course, I had a duty to the

15   putative class.

16             THE COURT:  Wow.  Gosh darn right you did.

17             MR. ANKCORN:  Well -- but there wasn't a deal to

18   upset until very late in this litigation.  Prior to that,

19   again, the numbers are --

20             THE COURT:  But we're talking -- let me just kind of

21   go at the point you just made.  So when you inked the deal,

22   and I guess your fiduciary duty sprang from the loins of the

23   deal, you knew at that moment that you had this big chunk of

24   people that are class members that you had referred out for

25   lawsuits, did you not?

1    MR. ANKCORN:  Yes.

2    THE COURT:  Okay, then.  I mean, I just don't -- I

3  mean, I see that as kind of a weasely, a word I use advisedly,

4  response to my question.  I didn't have a fiduciary duty until

5  I inked the deal.  For crying out loud.  Maybe what I ought to

6  be doing here is ordering you to show cause why you shouldn't

7  be removed as one of the class counsel.

8    MR. ANKCORN:  I appreciate that, your Honor.  My

9  understanding is that all of those names of those potential

10  claimants that were referred over to other counsel had already

11  been notified to Ocwen well before we entered into any

12  settlement negotiation.

13    THE COURT:  I'm not talking about whether they sat on

14  their rights.  They did.  I have said that before, and I'm

15  about to say it again.  They went ahead and negotiated the

16  settlement knowing full well that this problem existed.

17  That's why it's not a problem with regard to the settlement.

18  That's why I'm talking about it's a problem for you and your

19  status as class counsel.  You're sending people out there, and

20  you're just ticking off numbers on the tally of the people

21  that might add up to 4,000 or 1,000 or whatever the number is

22  you told me a minute ago.

23    MR. ANKCORN:  The total number of people, even

24  potentials, was well less than a hundred.

25    THE COURT:  I understand.  That's why I say 4,000 is

1    made up of 4,000 ones.  Okay?

2         MR. ANKCORN:  Right.

3         THE COURT:  So you could say the same thing.  Well,

4    Judge, I only referred out 3,998, so what's the problem?  It's

5    not 4,000.  Well, yeah, but it might end up being 4,000.

6         You're referring out people who are members of the

7    class.  And as far as you know, there could have been 3,950

8    other people that either opt out for other reasons or that end

9    up calling you or one of the other class counsel and are

10   similarly inclined to opt out after they hear whatever they

11   hear, and then the settlement goes kaboom.

12        MR. ANKCORN:  All I can say is when the mailing

13   happened in August, there was no chance -- it seemed to me

14   that there was no chance of having a deal.  We had had a

15   settlement negotiation with Judge Holderman.

16        THE COURT:  When was the negotiation with Denlow?

17        MR. ANKCORN:  Denlow was July 20th of 2017.

18        THE COURT:  Okay.  And that's the one where you made

19   the deal -- or got close to making the deal, and you made it

20   right after that, right?

21        MR. ANKCORN:  Right.

22        THE COURT:  Because nobody gave me that date.  I kept

23   looking for it, and that was the date that was missing.  So

24   that was July the 20th.

25        Okay.  Finish your point.

1          MR. ANKCORN:  So it didn't look in the summer that
2   there was anything going to happen, which is why we wanted to
3   investigate further preliminary injunction motion.  I honestly
4   felt that representing those class members would be well
5   served by getting other counsel.  I didn't want to be their
6   attorney because I wanted to represent the class and see if
7   there was a class there.  This was all part of that
8   investigative duty.

9          And I understand that there is the potential there,
10  but in August of 2016, I had no idea that we were going to get
11  to a deal almost a year later.  We, in fact, went to another
12  round of settlement negotiations at the end of October of
13  2016, and that was also fruitless.  It felt like we were
14  moving backwards and not forwards to either a class deal or a
15  class certification, although we had a class certification
16  date on calendar.

17         THE COURT:  Okay.  Thank you.  I've heard enough.

18         This is not a violation of the protective order.  I
19  said that before; I'm saying it again.  It got botched on your
20  side.  You can't rely on this so-called understanding that,
21  oh, he must have known that this was subject to the protective
22  order, because it's a circular argument.  It goes back to the
23  protective order, which required you to designate the
24  documents as confidential.  There's no violation of the
25  protective order.  Somebody's just going to have to suck it up

1   and own up or just live with the fact that it got botched when

2   it got produced.  And I don't have any reason to believe that

3   Mr. Ankcorn or anybody else did anything wrong once the

4   documents were ultimately designated as confidential.

5          This is also -- I don't know.  I mean, one of my

6   questions on this whole thing is what's the end game?  I

7   assume that at least part of what's contemplated is, you know,

8   maybe we want to blow out the settlement.  Go ahead and file

9   the motion if you want to, but you guys made a strategic

10  decision.  You knew this information well enough in advance of

11  the date that I actually approved the thing that you should

12  have told me then if there was an issue about that, so that's

13  not an issue.

14         As far as the statute is concerned, the

15  Gramm-Leach-Bliley Act, no private right of action that I can

16  figure out.  I guess the FTC enforces it.  If you want to go

17  to try to convince the FTC to sue Mr. Ankcorn for violating

18  the Gramm-Leach-Bliley Act, you know, be my guest.  I'm not

19  going to hold any further hearing.  I think everything that

20  needs to be found out has been found out.

21         And I only have one other question.  And that is,

22  there is a reference in one or more of the affidavits to the

23  fact that Mr. Ankcorn is getting subpoenas from time to time

24  for information.  And are these from people who represent --

25  these I take it are from people who represent people who have

1   asserted claims of one kind or another against Ocwen?

2           MR. ANKCORN:  Or people that are contemplating filing

3   their claim.

4           THE COURT:  Yeah.  So why shouldn't I tell you it's

5   time for you to give me all the data and you don't get to keep

6   it anymore?

7           MR. ANKCORN:  Whatever your Honor --

8           THE COURT:  Close of business today.  You give me

9   every last thing you've got on however many thumb drives there

10  is, and you keep nothing.  Paper, electronic, imaging,

11  backed-up copies.  Everything is gone.  You need to file an

12  affidavit within a week that says you've removed everything

13  that you have.  You've said it's not on anybody's computer but

14  yours.  Am I right?

15          MR. ANKCORN:  That's correct, your Honor.

16          THE COURT:  Okay.  Fine.  What else?

17          MR. BECKER:  Your Honor, can we have one

18  clarification on that point?  Which was that there was, in

19  addition to the class database and the class list, there was

20  apparently, as Mr. Ankcorn described in his declaration, there

21  was lists that he prepared of borrowers with the number of

22  phone calls.  We would like to make clear that that

23  information --

24          THE COURT:  When I say everything, I mean everything.

25  I mean anything that you've prepared, any downloads of it, any

1    printouts of it, anything that you've got that's derived from

2    it, it needs to all be gone from your computer.  And put it

3    on, like I say, some sort of a media and give it to me, and I

4    will retain it.  And at some point hopefully I will be able to

5    throw it out or give it back to somebody or whatever.

6              Okay?  I'll see you hopefully not before the --

7              MS. TERRELL:  Your Honor, I apologize.

8              THE COURT:  -- settlement approval update.

9              MS. TERRELL:  We had -- Mr. Burke and I had requested

10   a status conference --

11             THE COURT:  Yes.

12             MS. TERRELL:  -- for issues that are related to but

13   not identical to what you just addressed.

14             THE COURT:  And that would be what?

15             MS. TERRELL:  We have become aware of material facts

16   that we feel ethically obligated to disclose to you.

17             THE COURT:  And when are you planning to do that?

18             MS. TERRELL:  I can do it right now, or we can do it

19   later.  Those facts relate to many of the issues that were

20   just discussed in court.

21             THE COURT:  Um-hmm.  So what is it?

22             MS. TERRELL:  These are the facts.  And we don't make

23   this disclosure lightly.  We talked to ethics counsel, but we

24   take our duties as --

25             THE COURT:  Just tell me.  Okay?

1          MS. TERRELL:  -- class counsel very seriously.

2          THE COURT:  Just get to the point.

3          MS. TERRELL:  On June 2nd, 2017, Mr. Ankcorn sent a

4 letter to Earl Simpson advising him that his cell phone number

5 had received at least 1275 calls from Ocwen and asking him to

6 call or email Ankcorn Law to discuss his experiences with

7 Ocwen.  I have a copy of that letter.

8          THE COURT:  Give it to me.

9          MS. TERRELL:  Ankcorn Law sent to Mr. Simpson --

10         THE COURT:  Give it to me.  Keep reading.

11         MS. TERRELL:  Ankcorn Law sent to Mr. Simpson a

12 retainer agreement with which Mr. Simpson signed and returned

13 in June of 2017.  I have a copy of the retainer letter.

14         Mr. Simpson was added to the Gramm litigation as a

15 plaintiff in October 20th of 2017.  Mr. Simpson received the

16 class notice.  His son, Patrick, called --

17         THE COURT:  Class notice from this case?

18         MS. TERRELL:  Yes.  His son, Patrick, called Ankcorn

19 Law, and he was encouraged to opt out of the settlement by

20 Benjamin who works for Ankcorn Law.

21         THE COURT:  Do you know Benjamin's last name?

22         MS. TERRELL:  I do not know Benjamin's last name, but

23 I have confirmed --

24         THE COURT:  Is there a Benjamin that works for your

25 law firm?

1        MR. ANKCORN:  Yes.

2        THE COURT:  What's his last name?

3        MR. ANKCORN:  Charles.

4        THE COURT:  Okay.  Keep going.

5        MS. TERRELL:  On November 30th, 2017, Mr. Simpson

6    received a letter and opt out from Ramona Ladwig at West Coast

7    Litigation, also known as Hyde & Swigart.  On December 21st --

8        THE COURT:  Hyde & Swigart is the counsel of record

9    currently in the Gramm case, right?

10        MS. TERRELL:  Yes.  On December 21st, 2017,

11    Mr. Simpson received an email from Mr. Ankcorn updating him on

12    the Gramm case, advising him of the Snyder settlement,

13    introducing him to Hyde & Swigart, telling him that Ankcorn

14    Law has to step out of the Gramm case and releasing his lien

15    in the case.

16        THE COURT:  Okay.  So first of all, this letter,

17    which give to these folks to look at, it's identical to what I

18    read except it does have the field in it that you said was

19    deleted.

20        MR. ANKCORN:  Right.  This set of letters is what I

21    described in yesterday's declaration where there were -- if I

22    can get the specific reference -- that was paragraph 6.  These

23    letters were sent out -- this was a follow-up letter to people

24    who had -- a subset of the people who had already gotten the

25    first letter of August of 2016.  I said those letters were

1  sent out beginning in early February 2017; the last such

2  letter was mailed on June 2, 2017.  I describe the purpose for

3  the follow-up investigation.

4         To be entirely clear, I did -- it is not true that we

5  encouraged Mr. Simpson to opt out.

6         THE COURT:  How do you know?  Did you talk to

7  Benjamin?

8         MR. ANKCORN:  Yes.

9         THE COURT:  How did you know to talk to Benjamin?

10        MR. ANKCORN:  Because Ms. Terrell informed me about

11  Mr. Simpson's confusion in December.  I don't remember the

12  exact date.

13        THE COURT:  Where does Benjamin work?

14        MR. ANKCORN:  He works from his house in San Diego.

15        THE COURT:  Okay.  And what did Benjamin tell you?

16        MR. ANKCORN:  Benjamin told me and backed it up by

17  showing me some texts that he told Mr. Simpson to -- that he

18  couldn't -- said to him you couldn't both make a claim in the

19  class settlement and continue to sue individually, that he had

20  to choose one or the other.  I then followed up with

21  Mr. Charles and told him to tell him to talk to Hyde & Swigart

22  because we no longer represented him.  I'm not sure that he

23  had that --

24        THE COURT:  This is somebody that works for your law

25  firm?

1    MR. ANKCORN:  Yes, he is a contractor.

2    THE COURT:  Okay.  Do they have any kind -- do they

3  have any kind of a script or notes that they were given on how

4  to deal with class members who called in?

5    MR. ANKCORN:  Not really.  What I do is if a phone

6  call comes in, I will hand that message off to one of my staff

7  and say, can you get back to this guy and tell him X, Y, and

8  Z.

9    It seems like, from the text messages, that he got

10  this confused with another person who I had spoken to.

11    THE COURT:  Who is the "he"?

12    MR. ANKCORN:  Mr. Charles got the message confused,

13  was supposed to speak to another former client and not

14  Mr. Simpson.  I actually instructed Mr. Charles back in June

15  we wouldn't be retaining Mr. Simpson, that we --

16    THE COURT:  No.  You have that flip-flopped.  You

17  don't retain clients.

18    MR. ANKCORN:  Well, to retract the offer of

19  retention.  He told us that he wasn't interested in June, and

20  he was looking for other counsel.

21    THE COURT:  Did you have anything else?

22    MS. TERRELL:  I do not, your Honor.

23    THE COURT:  The body language on that one was kind

24  of --

25    MS. TERRELL:  I have the engagement agreement.  I

1  have personal --

2         THE COURT:  Say it again.

3         MS. TERRELL:  I have the engagement agreement from

4  June of 2017.  I have had personal conversations with

5  Mr. Simpson's son who dealt with Benjamin repeatedly.

6         THE COURT:  So I'll call him Mr. Charles because --

7  so he has two first names, but we'll use his actual last name,

8  Mr. Charles.  So the person that Mr. Charles is said to have

9  said you need to opt out or advised him to opt out, was that

10  Mr. -- was it the guy or his son?

11         MS. TERRELL:  His son.

12         THE COURT:  Okay.  So that's the person that had the

13  conversations.

14         MS. TERRELL:  That's correct.

15         THE COURT:  And what were you about to say about you

16  had conversations with him and?

17         MS. TERRELL:  And he provided the engagement

18  agreement that was signed by his father with Ankcorn Law.

19         THE COURT:  And the date of that is July the

20  something?

21         MS. TERRELL:  There is no date on it.  He told me it

22  was signed in June.  It was done electronically.

23         THE COURT:  And that was part of the same mistake?

24         MR. ANKCORN:  Our records show that he told us, no,

25  that he didn't want to be represented by us.  I guess that we

1   didn't cancel the electronic signature form in time, and then

2   he changed his mind and hit the sign line.  All I can say is

3   he was later informed that we were not representing anymore,

4   that we had a settlement deal, that we were going to be

5   settlement counsel, referred him over to Hyde & Swigart.

6   There was some confusion about whether he was represented or

7   not, so in December, December 21st, I sent out an email to

8   everybody who I could find who I had represented in 2017

9   relating to Ocwen saying, everybody, by the way, to confirm

10  our earlier conversations, we are not in this.  This is over.

11  You need to speak with -- and I directed them to Hyde &

12  Swigart, which, again, should have been --

13          THE COURT:  How many plaintiffs are in the Gramm

14  case, right now, Mr. Fleischmann?

15          MR. BECKER:  Approximately 47, your Honor.  It

16  started with five plaintiffs represented by Mr. Ankcorn.

17          THE COURT:  Right.  It was a big chunk that got added

18  in.

19          MR. FLEISCHMANN:  42 after the confidentiality and

20  while Mr. Ankcorn was still of record in that case.

21          MS. TERRELL:  Your Honor, I have a December 21st

22  email, if you'd like to read it.

23          THE COURT:  Yeah.  If you have another copy, set it

24  on the thing there so other people can look at it while I'm

25  looking at it.

1          Pat Simpson, is that the son?

2          MS. TERRELL:  Yes.

3          THE COURT:  So he's forwarding something that he got

4   from somebody with, quote/unquote, West Coast Litigation.

5          And that's something that's a contractor for your law

6   firm, Mr. Ankcorn?

7          MR. ANKCORN:  No.  Hyde & Swigart is the name of the

8   law firm.  They use the URL of West Coast --

9          THE COURT:  Okay.  So this is somebody at Hyde &

10  Swigart to Mr. Ankcorn, cc's to a whole bunch of people, one

11  of whom is Mr. Simpson or his father.  And then the son is

12  forwarding this to Ms. Terrell and Mr. Burke.  Okay.  Now I've

13  got that.

14         MR. ANKCORN:  Page 2 is my original.

15         THE COURT:  Don't talk.  I am reading.

16         MR. ANKCORN:  Sorry.

17         THE COURT:  Okay.  So you want to tell me what your

18  thoughts are about this?  Actually, I'm going to ask that a

19  different way.  I am not going to ask whether you want to tell

20  me.  You wanted to bring this up.  So what are your thoughts

21  about this?  When I say "this," I mean all of the stuff you've

22  talked about.

23         MS. TERRELL:  We feel ethically obligated to bring

24  these issues to your attention.

25         THE COURT:  You already told me that.  That's not

1    what I'm asking, and you know that's not what I'm asking you.

2    So get to the point.

3          MS. TERRELL:  We are concerned that there was a

4    concurrent representation of individual high-value plaintiffs

5    with claims against Ocwen while Mr. Ankcorn was also class

6    counsel.  We are concerned that there were actions taken to

7    encourage class members to opt out that could potentially

8    jeopardize the settlement because of the 4,000 person tipover.

9    And we think -- we thought we should raise those issues with

10   your Honor.

11         We also believe that the documents we have provided

12   are inconsistent with some of the statements that Mr. Ankcorn

13   has made both in court and in declarations.

14         THE COURT:  Which ones?

15         MS. TERRELL:  Prior to his declaration of yesterday,

16   he had repeatedly indicated that the letters were sent out by

17   the fall of 2016.  We were shocked to learn that there was a

18   letter sent in June of 2017.

19         In addition, we're very concerned about the fact that

20   the motive for sending the letters, both the first set and the

21   second set, has been tied to developing facts for the

22   injunction or the class certification.  We were completely

23   unaware of any letter campaigns and certainly the letters that

24   went out in the summer of 2000- --

25         THE COURT:  When you say "we," who is the we?

1          MS. TERRELL:  Everyone other than Mr. Ankcorn on the

2    plaintiffs' side.

3          THE COURT:  Keep going.

4          MS. TERRELL:  Certainly by the time the letters went

5    out in the summer of 2017, everything -- there was no more

6    investigation to do with regard to the injunction.  Everything

7    was basically done at that point.  And, again, even though we

8    were handling the briefing and did the hearing, we were not

9    aware that letters were sent out.  We feel that those

10   statements about the purpose of those letters appears to make

11   it look like we were involved in them, which we were not.

12   We've advised Mr. Ankcorn of our concerns about this

13   repeatedly and also appears to be a misrepresentation about

14   the intent of sending those letters.

15         THE COURT:  So what you're telling me in a sort of a

16   little bit of a roundabout way is that, well, if what the

17   story is about the letters is that they were being sent out to

18   try to generate information about the preliminary injunction,

19   we were part of that too.  We had no idea it was going on, so

20   that suggests maybe there was another -- maybe the purpose of

21   the letters was something other than that.  Is that --

22         MS. TERRELL:  I believe that to be the case, yes.

23   Yes.  That is our concern.  We sent a letter to Mr. Ankcorn

24   advising him of the statements that he had made in court both

25   verbally and in writing that we believed were inconsistent

1  with the facts that we became aware of through Mr. Simpson's
2  call.
3          THE COURT:  Anything you guys want to say?
4          MR. FLEISCHMANN:  The second-to-the-last paragraph of
5  Mr. Ankcorn's email on page 3 says that "In order to keep your
6  individual claims alive, you will need to file an opt out
7  request."
8          That looks to me like it's soliciting, encouraging
9  opt outs.
10         THE COURT:  Is there law about this?
11         MR. FLEISCHMANN:  What?
12         THE COURT:  Is there law about this, about class
13  counsel and what their obligation is and what they can and
14  can't do as it relates to, you know, people opting out of a
15  preliminarily approved settlement?
16         MS. TERRELL:  My research shows that the law is that
17  even in the context of a class action, an attorney who has
18  been appointed class counsel owes an undivided loyalty to the
19  class.  I believe that means it's inconsistent with that
20  loyalty to encourage individual members to opt out, especially
21  when there is a tipover provision.
22         THE COURT:  Okay.  I'll come back to that in a
23  second.  I was reminded of two things.  I got two claim forms
24  sent to me.  I'm going to give those -- if you can give those
25  to Ms. Terrell.  I also got an opt out request that was mailed

1    to me.  I'm just going to have that entered on the docket.

2    Although I think we need to -- it's got the person's cell

3    phone numbers in it, and so I think when I enter it on the

4    docket -- because it's both an opt out and an objection to the

5    settlement.  She is kind of saying I don't think it's enough

6    money.

7          MS. TERRELL:  Would you rather just give it to us and

8    we can file it in a redacted form?

9          THE COURT:  Yeah, I suppose that would be fine.  I

10   mean, I think everybody is -- the lawyers are all entitled to

11   see the unredacted version.

12         MS. TERRELL:  Sure.

13         THE COURT:  If I file it under seal, you guys can see

14   it, right?  No?

15         MR. FLEISCHMANN:  I don't think so.  And we don't

16   have any objection to the Court providing it to class counsel

17   for delivery to the settlement.

18         THE COURT:  I will give it to Ms. Terrell.

19         MR. FLEISCHMANN:  And we will all see it.

20         THE COURT:  You will deal with that.

21         Okay.  I don't have either the time or the

22   inclination to hear more on this today, but I guess I'm going

23   to go back to something I said before.

24         Mr. Ankcorn, you're directed to show cause why you

25   shouldn't be removed as class counsel.  The basis for the show

1  cause order is, let's just say, everything that we've talked

2  about today, including in particular what Ms. Terrell just

3  said.  But in general terms, it has to do with the at least

4  allegation that you encouraged people or directed people or

5  suggested to people to opt out.

6  There's also been a suggestion that you may have made

7  some incorrect representations in affidavits, so that's all

8  part of it too.  You've got ten days to respond to that.  Ten

9  days is -- actually, that's a holiday.  So it would be the

10  Tuesday of that week.  It's the 17th of -- 16th of January.

11  And I'll see what I need after that.  I want to look at that

12  response, and then I'll see whether I need to have anybody

13  else file anything or not.  Okay?

14  MR. ANKCORN:  You want that in the form of a

15  declaration, your Honor?

16  THE COURT:  I'm not going to give you legal advice.

17  I want it in whatever form you think is appropriate.  And if I

18  don't think it's sufficient, then I'll decide that after I

19  actually see what I get.  Okay?

20  Anything else?

21  MR. ANKCORN:  I'm sorry.  Your Honor, you previously

22  ordered me to destroy all the class data as well.

23  THE COURT:  Yeah.  No, I didn't order you to destroy

24  it.  I ordered you to give it to me.

25  MR. ANKCORN:  Okay.

1          THE COURT: You are to take it off every place you've

2  got it and give it to me. If what that means is a couple of

3  pack animals are going to be showing up here in a couple of

4  days with boxes of stuff, that's fine. I've got places to put

5  it.

6          MR. ANKCORN: Would you like the same deadline for

7  that?

8          THE COURT: No, I said I wanted that way faster. I

9  don't remember what I said, but you'll have to go back and

10  reconstruct it from whatever I was saying. I've got to move

11  on to something else. People have been waiting here for

12  70 minutes for something I was supposed to do 70 minutes ago.

13          MR. BECKER: One point of clarification, your Honor.

14  Paragraph 6 is a protective order that is currently in effect.

15  Says, "If a party designates a document as confidential after

16  it was initially produced, the receiving party on notification

17  of the designation must make a reasonable effort to assure

18  that the document is treated in accordance with the provisions

19  of this order."

20          We would ask that any data that was shared by

21  Mr. Ankcorn with Hyde & Swigart firm, the Kazerouni firm, he

22  advises them of the existence of the protective order and that

23  they should be bound by the terms of the protective order.

24          THE COURT: What would that mean in practical terms?

25          MR. BECKER: Well --

1        THE COURT:  So what he says he told them is that Jane

2  Jones got 4,118 calls.

3        MR. BECKER:  Right.

4        THE COURT:  Okay.  So what would that mean for Hyde &

5  Swigart?

6        MR. BECKER:  That means that they should not

7  disseminate that information to another plaintiffs' firm or

8  anyone else.  They should treat that as confidential.

9        THE COURT:  Do you have any problem with doing that?

10       MR. ANKCORN:  I'll tell them, certainly.

11       MR. BECKER:  Hyde & Swigart, Kazerouni, and any other

12  firms that might have received it.

13       THE COURT:  Yeah, I agree with that.  Okay.  Thanks.

14       MR. BECKER:  Thank you, your Honor.

15       MR. ANKCORN:  Thank you.

16       MR. FLEISCHMANN:  Thank you.

17   (Which were all the proceedings had in the above-entitled

18  cause on the day and date aforesaid.)

19   I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.
20

21  _____     _____
     Carolyn R. Cox              Date
     Official Court Reporter
22  Northern District of Illinois

23  /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

24

25