IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KEITH SNYDER, individually and on ) Docket No. 14 C 8461
behalf of all others similarly ) 16 C 8677
situated, et al., )
                                   )
                     Plaintiffs,  )
                                   )
          vs.                      ) Chicago, Illinois
                                   )
OCWEN LOAN SERVICING LLC,          ) April 5, 2018
                                   ) 9:30 o'clock a.m.
                     Defendant.    )

TRANSCRIPT OF PROCEEDINGS - MOTION
BEFORE THE HONORABLE MATTHEW F. KENNELLY

APPEARANCES:

For the Plaintiffs:    ANKCORN LAW FIRM, PLLC
                       BY:  MR. MARK DANIEL ANKCORN
                       1060 Woodcock Road, Suite 128
                       Orlando, FL  32803
                       (321) 422-2333


                       BURKE LAW OFFICES, LLC
                       BY:  MR. ALEXANDER HOLMES BURKE
                            MR. DANIEL J. MAROVITCH
                       155 North Michigan Avenue, Suite 9020
                       Chicago, IL  60601
                       (312) 729-5288


                       TERRELL MARSHALL LAW GROUP PLLC
                       BY:  MS. BETH ELLEN TERRELL
                       936 North 34th Street, Suite 300
                       Seattle, WA  98103
                       (206) 816-6603


Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                       Official Court Reporter
                       219 S. Dearborn Street, Suite 2102
                       Chicago, Illinois  60604
                       (312) 435-5639

1  APPEARANCES CONTINUED:

2
                         THE CABRERA FIRM, APC
3                        BY:  MR. GUILLERMO CABRERA
                         600 W. Broadway, Suite 700
4                        San Diego, CA  92101
                         (619) 500-4880
5

6                        HEANEY LAW FIRM, LLC
                         BY:  MR. MARK LUTHER HEANEY
7                        601 Carlson Parkway, Suite 1050
                         Minnetonka, MN  55305
8                        (952) 933-9655

9

10  For the Defendants:  LOCKE LORD LLP
                         BY:  MR. SIMON A. FLEISCHMANN
11                       111 South Wacker Drive
                         Chicago, IL  60606
12                       (312) 443-0462

13
                         HUNTON & WILLIAMS LLP
14                       BY:  MR. RYAN ANDREW BECKER
                              MR. BRIAN VINCENT OTERO
15                       200 Park Avenue
                         New York, NY  10166
16                       (212) 309-1000

17
                         PILGRIM CHRISTAKIS LLP
18                       BY:  MS. JENNIFER LISA MAJEWSKI
                         321 North Clark Street, 26th Floor
19                       Chicago, IL  60654
                         (312) 939-0953
20

21

22

23

24

25

1   (The following proceedings were had in open court:)

2          THE CLERK:  Case No. 16 C 8677, Beecroft v. Ocwen

3   Loan.

4          THE COURT:  That's part of Snyder, so call Snyder

5   too.

6          THE CLERK:  Okay.  14 C 8461, Snyder v. Ocwen Loan.

7          THE COURT:  So everybody get in a spot before anybody

8   gives your names, and we'll kind of go across the room.

9          All right.  So starting on this end.

10          MS. MAJEWSKI:  Jennifer Majewski on behalf of

11   Wilmington Trust.

12          THE COURT:  You got to project more.  You got to

13   project.

14          MS. MAJEWSKI:  I'm sorry.  Jennifer Majewski on

15   behalf of Wilmington Trust.

16          MR. FLEISCHMANN:  Good morning, your Honor.  Simon

17   Fleischmann on behalf of Ocwen.

18          MR. BECKER:  Good morning, your Honor.  Ryan Becker

19   on behalf of Ocwen.

20          MR. OTERO:  Brian Otero on behalf of Ocwen.

21          MS. TERRELL:  Beth Terrell on behalf of plaintiffs.

22          MR. BURKE:  Alex Burke for plaintiffs.

23          MR. MAROVITCH:  Dan Marovitch for plaintiffs.

24          MR. CABRERA:  Guil Cabrera for plaintiffs.

25          MR. HEANEY:  Mark Heaney for the plaintiffs.

1    MR. ANKCORN:  Mark Ankcorn for the plaintiffs.

2    THE COURT:  Okay.  Is there anybody who is not up

3  here who is in the room who wants to be heard, who wants to

4  speak about the proposed settlement to the class action in the

5  Snyder and Beecroft v. Ocwen case?  If so, just stand up, and

6  I'll Know you want to talk.

7    Nobody is standing up.  Okay.  So it's 9:40.

8    MR. BURKE:  Your Honor, Tracee Beecroft is in the

9  gallery, the named plaintiff.  She doesn't wish to speak, but

10  I thought I would recognize her.

11    THE COURT:  Okay.

12    MR. BURKE:  We also have another settlement class

13  member who is here to observe.

14    THE COURT:  All right.  So my questions -- I have

15  some questions that have to do with the settlement.  I have a

16  separate set of questions that have to do with attorneys' fees

17  that I may not deal with today.

18    So let me deal with the settlement aspects of this

19  first, and not necessarily in this order.

20    So the people who did the notice administration,

21  which is a company called Epiq, E-p-i-q -- well, it's actually

22  a division of Epiq.  It's called Hilsoft, H-i-l-s-o-f-t.

23    Anyway, there is a line in Ms. -- is it Mr. Azari or

24  Ms. Azari?  Is it Mr. or Ms. Azari, does anybody know?

25    MS. TERRELL:  It's Mr.

1          THE COURT:  Mr. Azari?

2          MS. TERRELL:  Mr.; Cameron, yeah.

3          THE COURT:  A line in his affidavit that says -- now,

4    there's female Camerons too.  That's why I asked.  Famous

5    actor, for example.  Anyway.

6          Epiq has agreed to cap fees at a million-six.

7          MS. TERRELL:  Yes.

8          THE COURT:  How do I have any clue whether that's

9    reasonable?  Nobody's given me anything on that.  I don't know

10   whether that's $100,000 in costs and a million and a half in

11   profit, the opposite, or something in between.  So there's no

12   way for me to tell.  I can't approve that without knowing

13   more.

14         MS. TERRELL:  Okay.

15         THE COURT:  Unless I'm missing something in here, and

16   I think I looked through everything.

17         MS. TERRELL:  Yeah, we didn't document the economics

18   of that.  I'll tell you that we negotiated very hard based on

19   their estimate and their actual costs.

20         THE COURT:  Yeah, so they're going to have to

21   document it.

22         MS. TERRELL:  Got it.

23         THE COURT:  So that's item number 1.  I don't know

24   whether that means costs, I don't know whether it means

25   discussion about regular rates.  I mean, the more that's put

1    in whatever gets filed, the better is, I guess, the big

2    picture aspect of that.

3            MS. TERRELL:  Absolutely.

4            THE COURT:  Okay.  Hang on a second.

5            On the -- there were a bunch of motions to file

6    excess pages and to file under seal.  Those are all granted.

7            I had a note on -- I can probably do it from memory

8    if I can't find my note, but I want to see if I can find my

9    note first.

10            Well, okay.  There were 367 exclusion requests

11    submitted, so my first question on that is potentially a small

12    one:  Does that include the three objectors?  In other words,

13    are we understanding the three objectors that if the objection

14    isn't sustained, that they want to be excluded?

15            MS. TERRELL:  They did not indicate an intention to

16    be excluded.

17            THE COURT:  In the three -- just so it's clear who

18    we're talking about here, we are talking about --

19            MS. TERRELL:  Yeah.

20            THE COURT:  That's attached to something different.

21    Give me the names.

22            MS. TERRELL:  Stuart, Skrichorina (phonetic), and

23    Seltzer are the three objectors.

24            THE COURT:  Yeah, okay.

25            MS. TERRELL:  Yeah.

1   THE COURT:  Now, that's not the person who submitted
2   the long set of materials, right?
3           MR. BURKE:  That was Mabel --
4           MS. TERRELL:  That's right.
5           THE COURT:  Right.  And so she -- what do you
6   understand her status to be?  Just an objector asking to be
7   excluded?  Both?  Neither?
8           MS. TERRELL:  I understood she just wanted to be
9   excluded.
10          THE COURT:  So she's part of the 367?
11          MS. TERRELL:  I think that's correct.  And it's 378,
12  your Honor.  It's gone up a little bit.  It's gone up a little
13  bit.
14          THE COURT:  When did the last ones come in?  Within
15  the last couple of weeks?
16          MS. TERRELL:  Within the last couple weeks, yeah.
17          THE COURT:  Is there some reason to kind of hold that
18  window open for a little bit?  Because it's not unusual for
19  these things to kind of come in at the last minute.
20          MS. TERRELL:  We think that's it.  Part of it is just
21  the postmark issue and then the claims administration are
22  processing it.  But we believe 378 is the final number.
23          THE COURT:  Okay.  So as far as --
24          MS. TERRELL:  Including late objectors.
25          THE COURT:  As far as the other three that you just

1  mentioned, we are understanding them to be not asking to opt
2  out but rather objecting.

3         MS. TERRELL:  That's our understanding.

4         THE COURT:  All right.  Do you have a different -- on
5  the defense side, do you have any different understanding?

6         MR. OTERO:  We do not have a different understanding,
7  your Honor.

8         THE COURT:  Okay.  And then my second question about
9  the 367 or the 378 or whatever it is, has anybody -- and 125
10 of those you said in a footnote are from the -- were submitted
11 by the Hyde, H-y-d-e, & Swigart law firm, S-w-i-g-a-r-t, has
12 anybody on the plaintiffs' side done any kind of -- or on the
13 defendant's side done any kind of an analysis to try to figure
14 out how many of the people -- the guy who is standing up, you
15 don't have to stand up in the back of the room.

16        Has anybody done any kind of analysis to try to see
17 how many of those people are people who were recipients of one
18 of Mr. Ankcorn's letters?

19        MR. OTERO:  We have not.

20        MS. TERRELL:  We have not.

21        MR. ANKCORN:  Your Honor, if I may?

22        THE COURT:  Have you?

23        MR. ANKCORN:  I looked at some of those numbers, and
24 as best I could tell, approximately 37 had received a letter
25 from me.

1          THE COURT:  Okay.  I'm actually kind of flummoxed by

2    the fact that the defendants, after you made such a big deal

3    out of all of this and after you heard -- and probably heard

4    vicariously about what I said in another case why you didn't

5    look to see --

6          MR. OTERO:  We don't have the letters.

7          THE COURT:  But you have a sense of who the high

8    value people are.

9          MR. OTERO:  Well, we know who opted out.  We don't

10   know who Mr. Ankcorn has been in touch with, so we can't do

11   the analysis.

12         THE COURT:  Yeah, but you could do it inferentially.

13   I mean, the whole pitch that you gave me is that what happened

14   is the people who got the higher number of calls all got

15   peeled off, and those are the people that the 2,000 or however

16   many letters went to.

17         MR. FLEISCHMANN:  We had asked for that disclosure.

18         THE COURT:  So let me ask it in a different way.

19   Have you gone through to see on these 125 exclusions or

20   the 378 or whatever it is how many of those are the people who

21   got more than a thousand calls?

22         MR. OTERO:  We have not.

23         THE COURT:  I am equally flummoxed.  Now I'm entitled

24   to be flummoxed.  I get your other point.  But, why?  I mean,

25   you guys made such a big deal out of this.  Big deal.

1       MR. OTERO:  Your Honor --

2       THE COURT:  No.  Big deal.  You basically asked me to

3  blow up the settlement about this.

4       MR. OTERO:  We did --

5       THE COURT:  You shook your head.  Is that not true?

6       MR. OTERO:  We did not ask you to blow up the

7  settlement, your Honor.  That --

8       THE COURT:  Well, you asked for a hearing, and it was

9  pretty clear that's where it was going.  If you want me to go

10 back and quote to you from your thing, I'll take 20 minutes

11 and go find it.

12      MR. OTERO:  I mean, your Honor, we -- look, we wrote

13 the papers.  That was not the relief that we were looking for.

14 We were looking for some sort of relief with respect to

15 Mr. Ankcorn.

16      We were not looking to blow up the settlement, your

17 Honor.  We did do the analysis you asked for --

18      THE COURT:  Good.  I am glad you're saying that now

19 on the record.  So that sort of takes that issue out of the

20 case.  Good.  Wonderful.

21      MR. FLEISCHMANN:  Your Honor --

22      THE COURT:  So you think it's 37, Mr. Ankcorn?

23      MR. ANKCORN:  Yes.

24      THE COURT:  Okay.

25      MR. FLEISCHMANN:  Your Honor, if I could interject on

1  the last conversation.

2  THE COURT:  So are you guys talking to each other?

3  MR. FLEISCHMANN:  Well, I would just like to point

4  out that we did ask for discovery in order to determine how

5  and with whom --

6  THE COURT:  That's why I asked the question in the

7  way I asked it the second time.

8  MR. FLEISCHMANN:  That's right.

9  THE COURT:  I don't need to hear from you right now,

10  Mr. Fleischmann.  We are going to have one person talking for

11  you guys, one, so figure out who it's going to be.

12  MR. FLEISCHMANN:  Fair enough.

13  THE COURT:  So one of the considerations that I

14  thought was going to get argued more in terms of justifying

15  the reasonableness of the settlement, and it's mentioned, but

16  it's not really discussed much, and I wanted to ask about it,

17  was this whole question about what I'll say are the finances

18  on the defense side of the case.  I mean, my understanding,

19  and I'm using that in a very sort of loose term, my

20  understanding at various points in time before the settlement

21  was reached was that -- and it was actually, I think, before

22  the case against the banks got filed -- was that the potential

23  liability, and even the settlement numbers that were being

24  talked about, were said to be beyond Ocwen's ability to pay.

25  That's why -- I think it was maybe even part of the

1  justification given for filing the lawsuit against the banks

2  and then merging it with this one.

3  And, you know, the numbers -- and I am not saying

4  that it's an unreasonably low number, but the numbers here are

5  way less than what we're talking about then, and I don't know

6  whether that's why nobody talked about financial ability to

7  pay or what.

8  So can somebody enlighten me a little bit, and I

9  don't care who it is, and I don't care if it's multiple

10  people, how, if at all, that should weigh into my

11  consideration of the reasonableness of the settlement?

12  MS. TERRELL:  Well, I can start.  I do know that we

13  spent substantial time discussing the financial situation of

14  defendants.  They made available -- I think their chief

15  financial officer at one of the mediation sessions walked us

16  through a lot of financials, we asked for additional

17  information, and we ended up being as satisfied as we could be

18  that the $17 and a half million was -- in addition to being

19  reasonable, was equipped for them to do given all of their

20  other liabilities.  And they're declining -- they're declining

21  market share around the country, but I think it would be

22  helpful --

23  THE COURT:  Yeah, if I'm remembering correctly, there

24  was a potential problem -- there was insurance but a potential

25  problem with coverage because of when the claim had been

1  tendered to the insurance company?  Am I right about that?

2        MS. TERRELL:  That's correct.  AIG denied coverage

3  because of a failure to tender.  We actually talked to

4  insurance coverage counsel, tried to test that, see if we

5  could find a way around it, and we were told that AIG was

6  likely to succeed on that denial.

7        THE COURT:  So then, basically, what you were talking

8  about is whatever you could get from Ocwen itself plus any of

9  the other entities.

10        MS. TERRELL:  That's right.

11        THE COURT:  Yeah.  So of the money that's being paid,

12  is it all from Ocwen, or is any of it from the banks that were

13  sued in a separate lawsuit?

14        MS. TERRELL:  It is all from Ocwen.

15        THE COURT:  Okay.  And have I already dismissed the

16  other lawsuit?

17        MS. TERRELL:  No.

18        MR. BURKE:  No, I think that you had designated --

19        THE COURT:  It's kind of trailing along behind this

20  one or something?

21        MR. BURKE:  I think they're related.

22        THE COURT:  They are a related case?  Okay.

23        By "the other lawsuit," I don't mean Beecroft; I mean

24  the lawsuit against the banks.

25        And if I'm recalling correctly, part of this

1    settlement is that case is going to be dismissed.

2              MR. BURKE:  Yes.

3              MS. TERRELL:  That's correct.

4              THE COURT:  So don't I have to think about the

5    reasonableness of that?  Because it's part of the settlement,

6    right?  So why is that -- that's not discussed in here at all.

7    So I need more on that.

8              MS. TERRELL:  Okay.

9              THE COURT:  And then the other thing I'd like to get,

10   and I wouldn't necessarily expect you to have this at your

11   fingertips right now, is -- and I know that there are not a

12   lot of objections, but, you know, sort of the way these things

13   work is -- and I get class notices too, and I see that, you

14   know, some hurt settlement, and I am going to get $4.98, and

15   there is a time cost and an aggravation cost in objecting, so

16   it's -- I know that we're supposed to read into -- something

17   into the fact that there are only three objections, and I do,

18   but that has to be tempered in some way.

19             But the objections all made a -- you know, I think a

20   colorable point that given the amount of calls that people

21   got, this isn't a lot of money.  And I think, objectively,

22   that's probably right.  But my question is have you -- was

23   there any analysis done to try to ascertain like what's kind

24   of the median number of calls that people got or what's the

25   high end, what's the low end?  What's the bell curve look

1 like, in other words?  Do you have any kind -- is there a way

2 of getting at that number?

3        MS. TERRELL:  We've done that analysis along the way.

4 I don't know if I recall what it is right now.

5        It's on the upper end.  I mean, people were receiving

6 hundreds of calls.

7        MR. BURKE:  As I recall, if you take the number of

8 unique cells that were called, the number of unique cell

9 numbers, and the number of calls and you divide the two, you

10 get about a hundred.

11        MS. TERRELL:  Yeah.

12        MR. BURKE:  So about a hundred calls --

13        THE COURT:  All right.  That's close enough.  You

14 don't need -- I mean, that gives me a general sense of it.

15 You know, whether it's 80 or 150, that gives me a general

16 sense.

17        All right.

18        MS. TERRELL:  I think that's part of the reason, your

19 Honor, why the claims rate is higher than we sometimes see in

20 these cases.

21        THE COURT:  Because it's something that people

22 remember --

23        MS. TERRELL:  People remember getting calls from

24 Ocwen.

25        THE COURT:  Yeah.  I mean, because the notice that

1  went out said that if everything breaks the way we think it's

2  going to, you're going to get 60 bucks, right?  So it didn't

3  say 600, so you can't attribute it to the fact that, oh, this

4  is this huge pile of money.  I mean, $60 is nothing to sneeze

5  at, obviously, but, yeah, that might be an explanation for why

6  you got more.

7           You got quite -- it ended up being 16 percent --

8           MS. TERRELL:  16 percent.

9           THE COURT:  -- as opposed to -- sort of an assumed 10

10  and 10 was probably a high-end assumption at that point, based

11  on the way these things normally go.

12           MS. TERRELL:  But we've seen that correlation.  Where

13  there's high call volume --

14           THE COURT:  Yeah, people remember --

15           MS. TERRELL:  -- of callers --

16           THE COURT:  Yeah.

17           MS. TERRELL:  -- you know, people remember.

18           MR. BURKE:  I would note, you Honor, that the

19  notice -- both the post card and the long form spelled out

20  what people could get if they opt out.

21           THE COURT:  Yeah, no, that's true.  It did,

22  absolutely.  You can get up to this, and -- yeah.  Right.

23           Okay.  Well, so you have a sense of the additional

24  information that I need.  So it's the thing about the

25  administrator and -- whatever the other thing was, I'm

1  blanking on it right now, but get the transcript or whatever.

2  So does anybody on this side of the "v.," the

3  backside of the "v.," want to say anything about whether I

4  should approve this or not?  Basically, what I'm going to do

5  is I am going to continue it because I want to get this more

6  information before I do that, but is there anything you want

7  to contribute at this point?

8  MR. OTERO:  We want it to be approved as well, your

9  Honor.

10  THE COURT:  Who do you represent?  You represent one

11  of the banks.

12  MS. MAJEWSKI:  Yes.

13  THE COURT:  Got it.  Okay.

14  And then on the question of fees, so I'll just kind

15  of tell you where my head's at at this point.  And the

16  question is is whether the percentages are right.

17  I mean, I certainly agree that the percentage of the

18  fund approach is the right approach to use.  I think the law

19  permits me to at least -- sometimes people refer to it as a

20  cross-check, to get a cross-check of what the -- I hate this

21  term -- loadstar numbers are, but I'd like to get that.  You

22  don't have to give me all of the detail, but I would like to

23  get sort of a high level summary, you know, from the Burke law

24  firm:  There were these lawyers who spent this amount of time,

25  this is our regular hourly rate, so if you did it on a

1  loadstar basis, this would be number, and so on. I would like

2  to get that from everybody who is looking for money here.

3         My second question about that is that in

4  Mr. Ankcorn's separate filing, it was approved the fees and

5  they should be divided up in the way that is set forth in the

6  agreement. And if I'm reading the agreement correctly,

7  it's -- for this, it's 75/25, 75 being Mr. Ankcorn, 25

8  being -- no, 75 being -- do I have it backwards? What is it?

9         MR. ANKCORN: It's effectively four parties.

10        THE COURT: No, I understand, but they were in

11 groups, weren't they? So the 75 group is who?

12        MR. ANKCORN: Is the Terrell firm, the Cabrera

13 firm --

14        THE COURT: And you.

15        And then the 25 group is Mr. Burke --

16        MR. ANKCORN: With --

17        MS. TERRELL: Mr. Heaney.

18        MR. ANKCORN: -- Mr. Heaney.

19        THE COURT: Got it. Okay.

20        So my question about that is is that something that

21 I'm supposed to include in an order, or do I leave that for

22 all of you to work out, fight out amongst yourselves? I mean,

23 I've never been asked to put that in an order, but I don't

24 know that I've ever had a situation where when you get to this

25 point, there's arguably some disputation among the lawyers on

1    the one side.

2         So what are people's views on that?  What's your

3    view?

4         MR. ANKCORN:  If I can start, your Honor.  Our

5    feeling is as long as the order includes the Ankcorn law firm

6    in the fees, that we can work out that division amongst

7    ourselves.  So we would not request --

8         THE COURT:  Okay.

9         MR. ANKCORN:  -- a specific order --

10        THE COURT:  I understand your point.

11        MR. ANKCORN:  -- so long as we are included.

12        THE COURT:  Your thoughts?

13        MS. TERRELL:  I think our point is the same.  Your

14   Honor has the discretion to deny fees to any of us, including

15   Mr. Ankcorn, and in that event, that would affect, we believe,

16   the contractual obligations.

17        THE COURT:  Yeah, I suppose it could, depending upon

18   how I went about doing it.  But, yeah, it would be sort of --

19   yeah, that would be a nice little first-year contracts law

20   hypothetical for a final exam, actually, mutual mistake, or --

21   I don't know what it is.  Whatever.  Anyway, we can worry

22   about that later.

23        So I'm going to make a semi-educated guess that

24   everybody in the room standing up here knows about the goings

25   in the other case that Mr. Ankcorn has in front of me.  And in

1   this case, I may have already raised some issues about that,

2   and the information that I got in the other case at least

3   arguably gives some color or flavor or whatever you want to

4   call it to what's alleged here.

5        And I set the other case, which is called AD v.

6   Credit One, I think the case number is 14 CV 10106, I set it

7   for a hearing, which I don't expect to take too long, but I

8   think I want to say two weeks from today, April 19th.

9        MR. ANKCORN:  April 17th.

10        THE COURT:  17th.  You're absolutely right.  Let me

11   just check and make sure it's showing up.

12        Yeah, 10:30 on April 17th.  That's the date I'm going

13   to continue this to.  And I think you should expect,

14   Mr. Ankcorn, that I'm going to want to ask you some questions

15   about this too, and we can probably do it all at once.

16        What I haven't really sort of worked through yet is

17   whether and the extent to which other people ought to be able

18   to ask Mr. Ankcorn questions.  So think about that, and we'll

19   address that at the time.

20        And so that's pretty much everything I had on my

21   agenda, I think.  Let me just check real fast on my notes and

22   be certain of that.

23        Yeah, that's about it.

24        So the final approval hearing is entered and

25   continued to 10:30 on the 17th of April.

1          MR. ANKCORN:  Your Honor, if I could?  With respect
2   to our obligation for fees and costs, I would just like to put
3   on the record that I acknowledge that my conduct in the case
4   was sharp and it was aggressive.  I did not think that I was
5   jeopardizing the settlement, and, thankfully, the facts as
6   they have come out have proven that we haven't jeopardized the
7   settlement.

8          But in light of the conduct here, we would ask to
9   reduce our request for expenses by an amount of $6,000.  That
10  represents the amount that was expended on the costs of
11  sending out letters and other things like that.

12         THE COURT:  Okay.  Thanks.  I'll take that into
13  account.

14         And I guess one of the -- just in terms of having
15  your ducks in a row and being prepared, I mean, one of the
16  things I'm going to ask you is whether what seems to have
17  occurred in these two cases -- in other words, the sending out
18  of letters to what might arguably be considered to be the
19  higher value members of the class or putative class,
20  ostensibly -- and I don't mean anything by "ostensibly" at
21  this point, but -- other than its literal meaning -- to
22  investigate further -- whether that's something that you've
23  done in other cases.  So just be prepared to answer that.
24  Okay?

25         I'll see you on the 17th of April.  Thanks.

1          MR. BURKE:  Thank you.

2          MS. TERRELL:  Thank you, your Honor.

3      (Which were all the proceedings had in the above-entitled

4   cause on the day and date aforesaid.)

5      I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.
6

7   Carolyn R. Cox                        Date
    Official Court Reporter
8   Northern District of Illinois

9   /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25